## COMMONWEALTH *vs.* RICHARD MURPHY.

Essex. May 7, 2004. - August 19, 2004.

Present: MARSHALL, C.J., GREANEY, COWIN, SOSMAN, & CORDY, JJ.

*Practice, Criminal,* Motion to suppress, Admissions and confessions, Voluntariness of statement, Waiver, Argument by prosecutor, Instructions to jury, New trial, Assistance of counsel, Fees and costs, Capital case. *Constitutional Law,* Admissions and confessions, Waiver of constitutional rights, Search and seizure, Assistance of counsel. *Due Process of Law,* Loss of evidence by prosecution. *Evidence,* Failure to produce evidence, Relevancy and materiality, Exculpatory, Alibi. *Felony-Murder Rule. Homicide. Intoxication. Conflict of Interest.*

A Superior Court judge correctly concluded, based on evidence presented at a hearing on a criminal defendant's motion to suppress statements made during police questioning, that the police did not subject the defendant to custodial interrogation prior to giving him Miranda warnings, and that the influence of alcohol and drugs did not prevent the defendant from making a voluntary waiver of his rights or a voluntary statement to police. [492-494]

A criminal defendant seeking relief from the Commonwealth's loss of allegedly potentially exculpatory evidence failed to satisfy his burden of establishing that access to it would have produced evidence favorable to his cause. [494-496]

Statements made by a prosecutor during closing argument at a criminal trial were based on the evidence and were not inappropriate, and therefore did not give rise to a substantial likelihood of a miscarriage of justice. [496]

At the trial of indictments charging armed assault in a dwelling and murder in the first degree, the judge did not err by instructing that armed assault in a dwelling could serve as the predicate felony for a felony-murder conviction, where the evidence demonstrated that the assaults that supported the defendant's convictions of armed assault were independent of the acts of personal violence that constituted a necessary part of the murders. [496-497]

At a murder trial, the judge's instructions to the jury on alibi, considered as a whole, did not shift the burden of proof as to the alibi to the defendant [497-498]; further, any error in the judge's instructions on malice, which improperly failed to inform the jury that only the first prong of malice could support a conviction of deliberately premeditated murder, did not give rise to a substantial likelihood of a miscarriage of justice, where the instructions clearly conveyed to the jury the requirements for a conviction of deliberately premeditated murder, and where the jury's verdicts left no doubt that they in fact found that the defendant had a specific intent to kill the victims [498-499].

A Superior Court judge did not abuse her discretion or commit other error of law in denying a criminal defendant's motion for a new trial, made on the ground that defense counsel had rendered ineffective assistance by failing to retain additional experts to investigate a mental illness defense, where the record demonstrated that the defendant himself had decided to waive such a defense; where counsel's decision, after investigation and consideration with other experts, not to pursue that theory of defense was a reasonable tactical choice; and where the defendant failed to demonstrate that counsel's failure to obtain the additional experts deprived him of any defense [499-504]; further, the defendant failed to demonstrate that counsel rendered ineffective assistance by failing to pursue a defense based on voluntary intoxication, where the record showed that defense counsel gave considerable focus to the issue at trial and that, to the extent that there was any reduced effort on the part of counsel on the issue, it was at the defendant's request [504-505].

A criminal defendant failed to demonstrate, in support of his motion for a new trial, that defense counsel had rendered ineffective assistance due to an alleged conflict of interest [506-507]; by denying him his right to testify [507-508]; or by failing to object to certain jury instructions [508-509].

A trial court judge did not err in denying a criminal defendant's motions for funds to retain expert witnesses in support of his motion for a new trial. [509-510]

INDICTMENTS found and returned in the Superior Court Department on March 16, 1994.

A pretrial motion to suppress evidence was heard by *James F. McHugh*, J.; the cases were tried before *Barbara J. Rouse*, J., and postconviction motions were heard by her.

*Alan Jay Black* for the defendant.

*Daniel I. Smulow*, Special Assistant District Attorney, for the Commonwealth.

COWIN, J. The defendant was convicted by a jury on an indictment charging two counts of murder in the first degree, each based on felony-murder, deliberate premeditation, and extreme atrocity or cruelty. He was also convicted of armed assault in a dwelling.[1] The defendant appeals from his convictions, as well as from the denial of his motion for a new trial. He raises numerous issues. He claims that (1) his motion to suppress his statements made at the Lynn police station should have been allowed because (a) he was subjected to a custodial interrogation before he was given the Miranda warnings and (b) neither his

---

[1]The indictment for armed assault referenced both murder victims.

waiver of his Miranda rights nor his subsequent statement was voluntary; (2) the judge improperly denied his motion to exclude evidence of a footwear impression on a greeting card (that matched his sneaker print) because the Commonwealth's negligent loss of a second foot print on a piece of linoleum retrieved from the murder scene deprived him of potentially exculpatory evidence; (3) the prosecutor's closing argument was improper[2]; (4) a substantial likelihood of a miscarriage of justice was created by incorrect instructions that (a) armed assault in a dwelling could serve as the predicate felony for a felony-murder conviction; (b) shifted the burden to the defendant as to the defense of alibi; and (c) defined the second prong of malice (see note 2, *supra*)[3]; and (5) his motion for a new trial should have been allowed on the grounds of (a) ineffective assistance of counsel (in specific regards detailed below) and (b) conflict of interest of trial counsel. The defendant also asserts that the judge abused her discretion by (a) failing to conduct a hearing on all the claims in his motion for a new trial and (b) erroneously denying his motions for funds to retain additional mental health experts. Finally, the defendant requests that we exercise our power under G. L. c. 278, § 33E, to reduce the murder verdicts or to grant him a new trial. We reject the defendant's arguments, determine that there is no reason to exercise our power pursuant to § 33E, and affirm the defendant's convictions and the order denying the motion for a new trial.

*Background.* We briefly describe the background of the events, leaving further details to discussion of the claims to which they relate. On March 5, 1994, the bodies of the victims, an elderly woman and her brother, were discovered by the police on the floor of their Lynn home. Each had been stabbed a number of times. Seeking background information about the victims, the police interviewed the Verb family (the victims'

---

[2]This argument is made for the first time on appeal; thus, the defendant asks that we review it pursuant to our authority under G. L. c. 278, § 33E, to determine whether there has been a substantial likelihood of a miscarriage of justice.

[3]The defendant also claims that the instruction on alibi violated the "due process clause of the United States Constitution and the Massachusetts Declaration of Rights."

next-door neighbors) and the defendant, who lived with the Verbs. After an initial discussion at the Verb home, the police asked the Verbs and the defendant to come to the police station.

Suspicion focused on the defendant when the police noticed that the bottom of his sneakers appeared "somewhat similar" to bloody footprints at the victims' home. The defendant was advised of his Miranda rights. After initially denying any involvement in the crime, the defendant stated that he awoke on a couch in the victims' home, saw the victims' dead bodies on the floor and asked himself, "What did I do?" He then "trashed the house" to make it "look like somebody broke in to rob it." He said that he found a knife on the kitchen floor, which he threw into a neighbor's yard. The police retrieved the knife, and testing revealed that fibers on it were consistent with fibers from the male victim's shirt. Other forensic tests also indicated the defendant's presence at the murder scene. At the outset of trial, the defense theories were "diminished capacity"[4] based on the defendant's alcohol and drug consumption or, alternatively, alibi. During trial, the former defense was abandoned when the defendant instructed his attorney to pursue only the alibi defense.

1. *Motion to suppress.* The defendant maintains that the judge erred in denying his motion to suppress his statements to the police because (a) he was subjected to a custodial interrogation before he was given the Miranda warnings, *Miranda* v. *Arizona*, 384 U.S. 436 (1966); and (b) when these rights were later provided to him, the influence of alcohol and drugs prevented him from making a voluntary waiver of his rights or a voluntary statement. See *Commonwealth* v. *Hosey*, 368 Mass. 571, 577-

---

[4]There is no "diminished capacity" defense in Massachusetts. See *Commonwealth* v. *Parker*, 420 Mass. 242, 245 n.3 (1995). Mental impairment may be relevant to issues of deliberate premeditation, extreme atrocity or cruelty, and intent and knowledge. *Commonwealth* v. *Hardy*, 426 Mass. 725, 729 n.5 (1998). Voluntary intoxication may preclude the defendant from forming the malice necessary to commit murder. See *Commonwealth* v. *Sires*, 413 Mass. 292, 299 (1992). Thus it may be a mitigating factor. See *Commonwealth* v. *Randolph*, 438 Mass. 290, 302-303 (2002). The judge instructed the jury on voluntary intoxication in conjunction with all three theories of murder in the first degree and murder in the second degree.

579 (1975). We summarize the facts from the motion judge's[5] comprehensive findings in his memorandum of decision on the defendant's motion to suppress.[6]

The defendant resided with the Verb family, who lived on the same street as the victims. He had a long history of alcohol and drug abuse, and had been arrested and incarcerated on several occasions. On March 5, 1994, the day before the defendant was arrested, he did not ingest any narcotics, but he began drinking beer at approximately 3 P.M., and he also imbibed two half pints of peppermint schnapps. On March 6, at 10 A.M., the defendant awoke and took some clonapin tablets to ameliorate a hangover. The defendant had taken clonapin before and was familiar with its effects.

That same day, while canvassing the neighborhood in the wake of the murders, State police Sergeant Dennis Marks and Trooper Elaine Gill visited the Verb home. After a brief discussion, they asked the occupants of the Verb home if they would be willing to come to the Lynn police station to talk further. All agreed except Frank Verb. While at the Verb home, Sergeant Marks and Trooper Gill noticed that the defendant was wearing black, high-topped sneakers.

The defendant and the Verbs (without Frank) arrived at the Lynn police station at approximately 11:15 A.M. The defendant, whose hangover had by now abated, played with one of the Verb grandchildren while police questioned the other members of the family. The defendant was the last of the group to be interviewed. At 12:15 P.M., Trooper Gill and Sergeant Marks began to interview the defendant in an "interrogation room." Initially, he made no incriminating statements.

Around 12:45 P.M., Trooper Gill asked the defendant if she could test his sneakers for comparison with the print found in the victims' house, and for the presence of blood. Trooper Gill informed the defendant that he was free to refuse this request, but the defendant agreed to let her take the sneakers. At 1 P.M., Trooper Gill read to the defendant a "consent for search" form which the defendant then signed. He also placed his initials

---

[5] A judge other than the trial judge heard the motion to suppress.

[6] The evidence at trial was essentially the same as that at the motion to suppress hearing.

beneath the handwritten words "1 pair Converse black hi-top sneakers." Trooper Gill then slowly and carefully read the defendant a list of rights that complied with the requirements of *Miranda* v. *Arizona, supra* at 475. The defendant acknowledged that he understood each right before Trooper Gill proceeded to the next. He read and signed the piece of paper from which Trooper Gill had been reading, and agreed to speak with the two troopers. At this point in time, the defendant was still uncomfortable from the effects of his drinking the previous day, but his thought processes and ability to make rational judgments were not inhibited.

Between 1 and 1:30 P.M., the defendant generally described his drinking and drug ingestion during the days preceding March 4, 1994. He described, among other things, how he had made "crack" cocaine pipes from peppermint schnapps bottles and tin foil.[7] At 1:30 P.M., the questioning was suspended and the defendant took a break to drink some water. The interview resumed from 1:45 until 2:05 P.M., when the questioning stopped for another water break.

Shortly after 2:05 P.M., Sergeant Marks left the room. Trooper Gill told the defendant that she was "concerned" because his sneakers resembled the print on a greeting card retrieved from the floor at the victims' home, and because the police had found a crack pipe at the murder scene similar to the one he had described. About this time, Sergeant Marks opened the door, announced that blood had been detected on the sneakers, and then left again. Trooper Gill told the defendant that this information added to her "concerns." With the defendant's permission, Trooper Gill summoned Sergeant Marks back into the room. Between 2:35 P.M. and 3:15 P.M., the defendant made a series of incriminating statements. Sergeant Marks reduced these statements to writing and allowed the defendant to read them when he had finished. The defendant signified his understanding of the writing by signing each page as well as the end. By 3:15 P.M., when the defendant signed the statement, he had not yet requested food, but had consumed several glasses of water, and he was given cigarettes when he requested them. Trooper Gill and

---

[7]The police had found a pipe meeting that description on the kitchen floor where the victims' bodies were discovered.

Sergeant Marks next investigated the information provided in the statements made by the defendant, which included obtaining a search warrant for the Verb home, while the defendant remained in the interrogation room.

At approximately 4:50 P.M., Sergeant Marks returned to the interrogation room. The defendant then volunteered a statement about the knife he said he had found in the victims' home. Sergeant Marks reduced this statement to writing and the defendant signed it. The defendant was arrested. While being booked, the defendant volunteered information to another officer about where he had obtained the knife. Once in a cell at the police station, the defendant asked for something to eat, and a sandwich was provided. He attempted to eat the sandwich but could not finish it and threw up.

At 11 P.M., the defendant was brought back to the interrogation room to watch the news on television. The investigators hoped that seeing the news report of his own arrest would prompt the defendant to make further statements. The defendant's reaction to the news story was that "he did not see how he could have done 'it' and that there must be some explanation for 'it.'" At this time the defendant was asked to identify his clothing from among the items collected from the Verb home. Trooper Gill also asked him whether anyone had been with him while he was at the victims' house on the evening of March 4 and the morning of March 5, 1994. The defendant stated that no one was with him. Sometime after 11:25 P.M., the defendant was returned to his cell.

The judge denied the defendant's motion in part and allowed it in part, suppressing the statements made by the defendant after he had watched the 11 P.M. news. See note 11, *infra.* The judge "view[ed] with great skepticism virtually all of the defendant's testimony at the hearing." He concluded that the police were "scrupulous and detailed" in advising the defendant of his rights; the defendant was well aware of his rights both from the police recitation of them on the day in question and from his earlier encounters with the police during which these rights had been provided many times; all the defendant's responses to police questioning (except those occurring after 11 P.M., see note 11, *infra*) were the "product of a free, voluntary

and knowing waiver of his rights''; and the statements were made voluntarily beyond a reasonable doubt. The judge further found that the defendant's discomfort resulting from a hangover did not overcome his free will, was not used by the police to "undercut his ability to resist and did not, in any sense of the word, produce the statements he made."

In reviewing a ruling on a motion to suppress evidence, we accept the judge's subsidiary findings of fact absent clear error. The weight and credibility to be given oral testimony is for the judge. See *Commonwealth* v. *Yesilciman*, 406 Mass. 736, 743 (1990), and cases cited. We "independently review[] the correctness of the judge's application of constitutional principles to the facts found." *Commonwealth* v. *Eckert*, 431 Mass. 591, 593 (2000), quoting *Commonwealth* v. *Magee*, 423 Mass. 381, 384 (1996). The Commonwealth bears the heavy burden of proving beyond a reasonable doubt a knowing, intelligent, and voluntary waiver of Miranda rights. *Miranda* v. *Arizona, supra* at 475. See *Commonwealth* v. *Day*, 387 Mass. 915, 921 (1983). The Commonwealth must also prove beyond a reasonable doubt that the statements were voluntarily made. Each determination must be considered in the totality of the circumstances. *Commonwealth* v. *Jackson*, 432 Mass. 82, 85 (2000). Here, the judge's findings are supported by the evidence and he correctly applied the law to the facts.

a. *Custody.* The defendant contends, for the first time in this court, that he was in custody during his "initial interview," i.e., the pre-Miranda discussion with Trooper Gill and Sergeant Marks that took place from approximately 12:15 to 12:45 P.M.[8] Although this claim was not before the motion judge, he made findings that assist our review. He concluded that this initial interview was not a custodial one and his findings are supported by the evidence.

"The determination of custody depends primarily on the objective circumstances of the interrogation, and not on the subjective views of either the interrogating officers or the person

---

[8]Because the defendant did not make this claim below, we review it solely to determine whether a substantial likelihood of a miscarriage of justice may have occurred. See *Commonwealth* v. *Williams*, 422 Mass. 111, 123-124 (1996).

being questioned. The critical question in making the custody determination is 'whether, considering all the circumstances, a reasonable person in the defendant's position would have believed that he was in custody.' " *Commonwealth* v. *Sneed*, 440 Mass. 216, 220 (2003), quoting *Commonwealth* v. *Brum*, 438 Mass. 103, 111 (2002). In making the custody determination, we examine four factors: (1) the place of the interrogation; (2) whether the police conveyed any belief or opinion that the person being questioned was a suspect; (3) whether the questioning is aggressive or informal; and (4) whether the suspect was free to end the interview by leaving the place of interrogation, or whether the interview ended with the defendant's arrest. *Commonwealth* v. *Sneed, supra.*

We apply the above analysis to the questioning of the defendant. Although the interview took place at the police station, the defendant went to the station voluntarily. He and the Verbs were asked to provide background information about the victims. Attendance was not mandatory; Frank Verb chose not to attend. At no time prior to 12:45 P.M. did the police convey to the defendant that he was a suspect (Gill did not express her "concerns" to the defendant until after 2:05 P.M.); he was asked to the police station as one member of a group and was, in fact, the last of the group to be questioned. The interview was an informal one, and the police questioned the defendant generally about the victims and their habits, customs, and visitors. As the judge found, the defendant was not in custody during this time and "was in fact free to terminate the interview and even leave if he had chosen to do so."[9]

b. *The defendant's Miranda waiver and statements.* At the conclusion of the first segment of the interview (12:15 — 12:45 P.M.), the police seized the defendant's sneakers. They told him that they wanted to compare the tread on his sneakers with the tread they had found on the greeting card at the murder scene and also perform tests for the presence of blood. Although Trooper Gill informed the defendant that he need not consent to the seizure of his sneakers and that it was "entirely up to him"

---

[9]The judge also found that the defendant made no incriminating statements during this early portion of the interview.

whether to agree, the defendant agreed to let the police take his sneakers.[10]

Trooper Gill then advised the defendant of his Miranda rights. The defendant waived the rights and made statements to the police. The defendant claims that, because he was under the influence of alcohol and drugs, neither his Miranda waiver nor his statements were voluntary. The judge found that it would be "difficult [for] the police [to] have been more scrupulous and detailed in advising the defendant about the . . . rights he had." In providing the Miranda warnings, the police stopped to ask the defendant whether he understood each right and gave him a Miranda warning form to read and sign. The defendant stated that he knew he had a right to remain silent, to have an attorney present during questioning and that his answers to questions could be used against him. Breaks were taken during the interview and the police provided the defendant with water and cigarettes at various times. The defendant responded appropriately to the police questions; his speech was clear and he appeared "alert, awake . . . [h]e wasn't groggy or drowsy . . . ." Even to members of the Verb family, he appeared no more than "hung over." The defendant could read and write, had an eleventh grade education, and had been arrested many times before. The evidence credited by the judge supports his conclusion that in the totality of the circumstances the defendant's waiver was knowing, intelligent, and voluntary and that his statements were made voluntarily.[11]

2. *Loss of evidence.* The defendant contends that the trial judge "erred under both the Fifth and Fourteenth Amendments to the United States Constitution and art. twelve of the Massachusetts Declaration of Rights" by denying his motion to

---

[10]The police also obtained the defendant's written consent to the seizure. No issue is raised regarding seizure of the sneakers.

[11]The judge did suppress the defendant's statements made after he watched an 11 P.M. news report of the murder. The judge found that the news broadcast had a "substantial emotional impact" on the defendant, "essentially" making the statement an "excited utterance." He found also that, due to the length of the defendant's interactions with the police (since noon that day), his generally poor physical condition and substance abuse, the late hour, and his lack of food, the defendant was physically and mentally weak by that time. The judge concluded that these statements were neither voluntarily made nor the product of a valid Miranda waiver.

prevent the Commonwealth from introducing evidence of footwear impressions found at the murder scene, including the footprint on the greeting card. There was testimony that this footwear impression matched the tread on sneakers that the defendant was wearing when he was questioned at the police station. The defendant claims that due process requires the exclusion of this evidence because the Commonwealth had lost another footwear impression found on a piece of linoleum at the victims' home. The Commonwealth's negligence, he asserts, prevented him from demonstrating that someone else was present at the murder scene. After an evidentiary hearing, the trial judge denied the motion because there was no evidence that the second footwear impression, if available, would establish a reasonable doubt regarding the defendant's guilt.

"When potentially exculpatory evidence is lost or destroyed, the culpability of the government will be weighed along with the materiality of the evidence and the potential prejudice to the defendant." *Commonwealth* v. *Olszewski*, 401 Mass. 749, 754 (1988), *S.C.*, 416 Mass. 707 (1993), cert. denied, 513 U.S. 835 (1994), quoting *Commonwealth* v. *Charles*, 397 Mass. 1, 14 (1986). "Evidence is material if, in considering the entire record, it creates a reasonable doubt as to the defendant's guilt that would not otherwise exist." *Commonwealth* v. *Otsuki*, 411 Mass. 218, 231 (1991). "A defendant who seeks relief from the loss or destruction of potentially exculpatory evidence has the initial burden . . . to establish 'a "reasonable possibility," based on concrete evidence rather than a fertile imagination,' that access to the [evidence] would have produced evidence favorable to his cause . . . ." *Commonwealh* v. *Dinkins*, 440 Mass. 715, 717 (2004), quoting *Commonwealth* v. *Cintron*, 438 Mass. 779, 784 (2003). We do not disturb the judge's decision except for a clear abuse of discretion. *Commonwealth* v. *Cintron, supra.*

The Commonwealth conceded its negligence in losing the second footwear impression, and the defendant did not suggest that the loss was in bad faith.[12] The judge did not abuse her discretion in determining that the lost evidence was not material

---

[12]Although the defendant now maintains that the judge "never ruled on the bad faith issue," he did not raise this issue below, and on appeal has not cited any evidence of bad faith by the Commonwealth.

because it would not have raised a reasonable doubt regarding the defendant's guilt. Two officers testified that the linoleum footwear impression looked similar to that on the greeting card. The defendant failed to satisfy his burden of establishing that access to it would have produced favorable evidence. *Commonwealth* v. *Willie*, 400 Mass. 427, 433 (1987).[13]

3. *Prosecutor's closing argument.* The defendant claims that the prosecutor improperly "inflamed the passions of the jury" by stating that the defendant "murdered both of these people in cold blood." No objection was made to the statement at trial; we review to determine whether there was a substantial likelihood of a miscarriage of justice. See *Commonwealth* v. *Johnson*, 429 Mass. 745, 748 (1999). The comments were based on the evidence and were not inappropriate. See *Commonwealth* v. *Rodriguez*, 437 Mass. 554, 565 (2002). Two elderly people, friends of the defendant, were stabbed to death in their home. The stab wounds to each victim were inflicted with "[v]ery severe force," and the male victim fought back, suffering defensive wounds. The evidence permitted an inference that the murders were unprovoked, senseless, and brutal, aptly described as killings "in cold blood."

4. *Judge's instructions.* The defendant posits that a substantial likelihood of a miscarriage of justice was created by errors in the judge's instructions. See *Commonwealth* v. *Wright*, 411 Mass. 678, 681 (1992).[14] We consider each argument in turn.

a. *Merger.* The defendant was convicted of murder in the first degree as to each victim on the theories of deliberate premeditation, extreme atrocity or cruelty, and felony-murder. The judge explained that the felony-murder rule substitutes the intent to commit the underlying felony for malice aforethought, and that the underlying felony in this case was armed assault in a dwelling with intent to commit a felony (here, robbery), see G. L. c. 265, § 18A. The defendant contends that the judge erred by instructing that armed assault in a dwelling could serve as the predicate felony for a felony-murder conviction because the

---

[13]Given our resolution of this issue, it is unnecessary to address the judge's alternate finding regarding joint venture.

[14]Counsel's failure to object to these errors is one of the grounds for the defendant's ineffective assistance of counsel claim. See *infra*.

conduct that supported his conviction of armed assault was not sufficiently "separate from the acts of personal violence that constitute[d] a necessary part of the homicide[s]." *Commonwealth* v. *Gunter*, 427 Mass. 259, 274 (1998). "Whether a particular felony is sufficiently independent from a killing to support a felony-murder conviction is a question that defies categorical analysis." *Commonwealth* v. *Kilburn*, 438 Mass. 356, 359 (2003), citing *Commonwealth* v. *Gunter, supra* at 275 n.15. Claims of merger must be reviewed on a case-by-case basis. *Commonwealth* v. *Gunter, supra.* We conclude that the instruction was correct.

The evidence supported findings that the defendant entered the dwelling armed with a knife, with the intent of robbing the victims, and that he stabbed each several times, causing each victim nonfatal wounds. There were separate assaults on each victim that were independent of the stabbings that actually led to the homicides. Thus, the acts constituting the assaults did not also cause the homicide, and were sufficient to support conviction under G. L. c. 265, § 18A. See *Commonwealth* v. *Kilburn, supra* (no merger where evidence of assault by means of brandishing pistol in addition to assault of shooting that caused victim's death).

b. *Alibi.* The defendant challenges the judge's statement in her instructions on alibi that it is "alleged that the Commonwealth has not proven beyond a reasonable doubt that the defendant was present at the time and place of the crimes. You have to decide how much [if] anything you believe or credit the alibi given in this case. If you believe the defendant's alibi, then the Commonwealth has failed to prove his guilt beyond a reasonable doubt and you must find him not guilty." The defendant claims that this instruction placed the burden on the defendant by stating, "if you believe the defendant's alibi." He has, however, taken the statement out of context.[15] The judge's instruction, considered as a whole, did not shift the burden of

---

[15]The instruction on alibi was as follows:

"You have to decide how much [if] anything you believe or credit the alibi given in this case. If you believe the defendant's alibi, then the Commonwealth has failed to prove his guilt beyond a reasonable doubt and you must find him not guilty. But even if you disbelieve some or all of the alibi evidence, the defendant is not automatically guilty. You still have to find, based on all the

proof as to alibi. Immediately after the challenged language, the judge reiterated the Commonwealth's burden of proving beyond a reasonable doubt that the defendant committed the crimes, including the fact that "he was there at the time." Although the instruction varied somewhat from that recommended in *Commonwealth* v. *McLeod*, 367 Mass. 500, 502 n.1 (1975), it was, if anything, more favorable to the defendant than the recommended instruction.[16] There was no error.

c. *Second prong malice.* As the defendant correctly notes, the judge's instructions improperly failed to inform the jury that only the first prong of malice can support a conviction of deliberately premeditated murder. See *Commonwealth* v. *Jenks*, 426 Mass. 582, 585 (1998). Rather, she instructed that either the first or the second prong of malice (specific intent to kill or specific intent to do grievous bodily harm) could support a conviction of deliberately premeditated murder. There was no objection to the instruction.[17]

While only first prong malice (intent to kill) may support a conviction of deliberately premeditated murder, see *Com-*

---

evidence, that the Commonwealth has proven his guilt beyond a reasonable doubt as I have explained it to you on the elements of the various crimes.

"The Commonwealth has the burden of proving beyond a reasonable doubt that the defendant committed the offense charged and, of course, that means that he was there at the time and not somewhere else. Keep in mind that the defendant has no duty or responsibility to call any witnesses or produce any evidence on his behalf. So, the fact that this issue may have been raised in the course of trial doesn't shift any burden to him whatsoever. The defendant is not required to rebut any evidence that the Commonwealth does introduce."

[16]We repeat here the instruction in *Commonwealth* v. *McLeod*, 367 Mass. 501, 502 n.1 (1975), quoting Devitt & Blackmar, Federal Jury Practice and Instructions § 11.31 (1970), and emphasize that it is the preferable instruction:

"Evidence has been introduced tending to establish an alibi, which amounts to a contention that the defendant was not present at the time when or at the place where he is alleged to have committed the offense charged in the indictment. If, after consideration of all the evidence in the case, you have a reasonable doubt as to whether the defendant was present at the time and place the alleged offense was committed, you must acquit him. The jury will always bear in mind that the law never imposes upon a defendant in a criminal case the burden or duty of calling any witnesses or producing any evidence."

See *Commonwealth* v. *Richardson*, 425 Mass. 765, 769 (1997).

[17]At the time of trial in 1995, this instruction was considered accurate. See *Commonwealth* v. *Judge*, 420 Mass. 433, 441 (1995).

*monwealth* v. *Diaz*, 426 Mass. 548, 553-554 (1998), we nevertheless conclude that the instructions as a whole clearly conveyed to the jury the requirements for conviction of deliberately premeditated murder: "First comes the deliberation, the premeditation, then the decision to kill, and finally the killing in furtherance of that decision." The judge also instructed that deliberate premeditation requires that the defendant "thought before he acted, that is, that he planned or formed a plan to murder after deliberation [and that] deliberation does not require any extended time . . . [but] may be a matter of days, hours or even seconds."

As the judge defined deliberate premeditation, a necessary condition of guilt was the specific intent to kill. The jury could not find deliberate premeditation without finding an intent to kill, thereby rejecting an intent to do grievous bodily harm. Thus, the jury's verdicts of murder in the first degree based on the deliberate premeditation theory leave no doubt that they in fact found that the defendant had a specific intent to kill the victims. The jury therefore found malice on the first prong of malice, which is met by proof of a specific intent to kill. See *Commonwealth* v. *Simpson*, 434 Mass. 570, 588 (2001); *Commonwealth* v. *Jenks*, *supra* at 585, quoting *Commonwealth* v. *Gibson*, 424 Mass. 242, 247, cert. denied, 521 U.S. 1123 (1997). Any error did not create a substantial likelihood of a miscarriage of justice.

5. *Motion for a new trial.* The defendant challenges the denial of his motion for a new trial on four main grounds. He claims that defense counsel was ineffective because he (a) did not retain additional experts to investigate a mental illness defense; (b) had a conflict of interest (previous representation of a defense witness); (c) denied the defendant his right to testify; and (d) failed to object to certain jury instructions. In reviewing the denial of a motion for a new trial, we examine the judge's conclusion to determine only whether there has been an abuse of discretion or other error of law. *Commonwealth* v. *Grace*, 397 Mass. 303, 307 (1986). We give special deference to the decisions of a judge who was, as here, the trial judge. *Id.*

Because the defendant has been convicted of murder, we consider his claim of ineffectiveness of counsel to determine

whether there exists a substantial likelihood of a miscarriage of justice, as required under G. L. c. 278, § 33E. *Commonwealth v. Wright,* 411 Mass. 678, 682 (1992). Thus, we consider whether there was an error in the course of the trial that was likely to have influenced the jury's conclusion. *Id.* An attorney's strategic decisions are not considered errors unless they are "manifestly unreasonable when made." *Commonwealth v. Coonan,* 428 Mass. 823, 827 (1999), quoting *Commonwealth v. Martin,* 427 Mass. 816, 822 (1998).

a. *Failure to investigate mental illness defense.* The judge who presided over the trial thereafter considered the issue whether counsel was ineffective for not pursuing further neurological evaluation of the defendant prior to trial. The defendant's trial counsel and Dr. Ronald Schouten, who had originally been hired by the defendant's trial counsel, testified at the hearing. We summarize the facts as found by the judge at the hearing on the motion for a new trial. Michael F. Natola, an experienced criminal defense attorney, was appointed to represent the defendant shortly after his arrest. Prior to trial, Natola began to explore the possibility of a mental illness defense. In March of 1994, Dr. Judith F. Goldberg, a forensic psychologist designated by the court, examined the defendant to determine his competency to stand trial and to ascertain whether there was a defense of lack of criminal responsibility. Dr. Goldberg found the defendant competent to stand trial, but also determined that "there appears to be a question of criminal responsibility" based on his psychiatric history.

Natola then engaged Dr. Robert Kinscherff, a psychologist and associate director for forensic services at Massachusetts General Hospital, and Dr. Ronald Schouten, director of law and psychiatry service at Massachusetts General Hospital. Based on an interview with the defendant and test results, Dr. Kinscherff concluded that the defendant did not suffer from a "major mental illness" and that there was "no gross evidence of psychosis," but, given the defendant's history of head injury and "self-reports" of other symptoms, Dr. Kinscherff did suggest a "neurological consultation to rule out temporal lobe dysfunction." After receiving this report, Natola discussed its conclusions with Dr. Kinscherff.

Dr. Schouten also interviewed the defendant and reviewed the reports by Drs. Kinscherff and Goldberg, and concluded that the defendant did not suffer from a "clear cut major mental illness." Dr. Schouten did not reach a conclusion as to the defendant's criminal responsibility, but opined that some of the actions the defendant reported "could be construed as evidence of awareness that he had done something unlawful." Dr. Schouten also reiterated Dr. Kinscherff's recommendation for further neurological testing. Following his receipt of this report, Natola spoke several times with Dr. Schouten regarding the viability of a defense based on the defendant's medical condition. Dr. Schouten expressed his concern that the defendant's admission that he disposed of the murder weapon tended to contradict his assertion that he had been experiencing a blackout during the time the murders occurred. Natola also reviewed reports by Dr. Wesley Profit, the director of forensic services at Bridgewater State Hospital (Bridgewater), where the defendant had been incarcerated, and Dr. Michael Annunziata, a physician hired by the Commonwealth. Neither expert found the defendant to be suffering from a mental illness or defect at the time of the murders, or that there was any evidence of lack of criminal responsibility.

Natola discussed these reports with the defendant "in great detail." Although he specifically told the defendant that Drs. Schouten and Kinscherff recommended further neurological testing, he advised the defendant that the medical reports indicated that he did not have a viable defense based on mental illness. The defendant told Natola that he was opposed to the assertion of a mental illness defense because, having spent time awaiting trial at Bridgewater, he preferred incarceration in a traditional penal institution. (A successful defense of not guilty by reason of insanity could result in his incarceration at Bridgewater. See *Commonwealth* v. *Mutina*, 366 Mass. 810, 811-812 n.1 [1975]. See also *Commonwealth* v. *Biancardi*, 421 Mass. 251, 252-253 & n.1 [1995].) Natola then recommended to the defendant that they adopt the defense of "diminished capacity" due to alcohol and crack cocaine use, because he believed it was the most likely way to avoid convictions of

murder in the first degree.[18] Initially, the defendant agreed with this suggestion. Natola also advised that alternative defenses could be pursued, i.e., that the defendant did not commit the murders, and alternatively that, if he did commit them, he was under the influence of drugs or alcohol, but he informed the defendant that in his experience this approach was rarely successful.

During the trial, the defendant told Natola that he did not commit the murders and did not want to proceed with a defense that would involve an admission that he committed them. Although he remained convinced that a diminished capacity defense was the preferable strategy, Natola acquiesced, and advised the judge that the defendant was abandoning "the defense based upon diminished capacity," and instead would only pursue "a line of defense based upon evidence that he was not responsible for the stabbings at all."

The judge determined that the defendant did not want a mental health defense because he did not wish to spend time at Bridgewater, and thus that the defense was unavailable as the result of his own decision. (She found that the defendant was "adamantly opposed to advancing any sort of mental health defense.") The essence of her conclusion is that the defendant waived a mental health defense. This finding is supported by the record. At the hearing on the motion for a new trial, the defendant's attorney said that the defendant did not want to pursue a mental illness defense because he preferred not to be incarcerated at Bridgewater, but rather wanted a traditional penal institution ("he made it clear to me, explicitly, that he did not care to be at Bridgewater"). We have stated that the decision whether to pursue a defense of lack of criminal responsibility is one the defendant must make. See *Commonwealth* v. *Federici*, 427 Mass. 740, 744-745 (1998). In that case, we stated that it is the defendant's choice "not to label himself as 'criminally insane' " when the defendant has been found

---

[18]We use the term "diminished capacity" here because that is the term used by the defendant. There is no defense of "diminished capacity" in Massachusetts. See note 4, *supra.* Apparently, the defendant uses the term to refer to a defense that would warrant a reduction in a finding of murder in the first degree to murder in the second degree. See *Commonwealth* v. *Parker*, 420 Mass. 242, 245 n.3 (1995).

competent and has been advised by both defense counsel and the judge of the consequences of his actions. *Id.* at 744. Here, there is no suggestion that the defendant was not competent to stand trial. To the contrary, he actively participated in his defense, including filing motions on his own behalf just prior to trial and actively consulting with his attorney throughout trial. (It is, of course, his competence at the time of trial that is relevant.)

The defendant maintains that his counsel should have pursued the recommendations of his two experts for further neurological testing. The contention is that, had counsel done so, the testing could have shown that the defendant was having a seizure or blackout during the murders. In possession of this additional information, the defendant argues, he would not have made the choice of abandoning the possibility of a defense of lack of criminal responsibility. The defendant bears the burden of establishing these facts. See *Commonwealth* v. *Bertrand*, 385 Mass. 356, 364 (1982), quoting *Commonwealth* v. *Bernier*, 359 Mass. 13, 15 (1971) (to extent defendant's motion for new trial is based on facts not apparent on face of record, defendant has burden of proving such facts).

As previously stated, the judge found that the defendant did not want a mental health defense because he did not wish to spend time at Bridgewater. Additional information concerning the likelihood of success of such a defense could not affect that decision. In addition, the judge concluded that, even had the defendant not been opposed to any mental health defense, trial counsel's decision not to pursue such a defense was not "manifestly unreasonable." She based her conclusion on the fact that five experts had examined the defendant (two of whom had examined him at his counsel's request)[19] and found that he did not suffer from major mental illness. "Defense counsel considered and investigated the defendant's mental condition and reasonably concluded that . . . such a defense was not vi-

---

[19]This fact distinguishes this case from *Commonwealth* v. *Roberio*, 428 Mass. 278 (1998), on which the defendant relies in support of this claim. In the *Roberio* case, in which ineffective assistance was found for failure to pursue a mental health defense, defendant's trial counsel never obtained any medical experts to test the defendant's sanity. See *id.* at 281–282.

able." The judge permissibly could find that a defense based on criminal responsibility had little chance of success, and that the evidence before her indicated only speculation that further testing would provide a viable defense. If so, it follows that counsel's decision not to pursue such a theory was a reasonable tactical choice.

Even if the defendant had not waived the defense, and even if counsel's decision was not reasonable, the judge found that the defendant did not demonstrate that his attorney's failure to obtain the neurological consultation deprived him of any defense. As the judge concluded, the "opinions of all [the] doctors that the defendant did not suffer from a major mental illness, combined with strong evidence of the defendant's consciousness of guilt cast substantial doubt on whether any mental health defense could be 'substantial.' " Thus, the defendant has not shown that there was an error in the course of the trial that was likely to have influenced the jury's decision. See *Commonwealth* v. *Wright, supra* at 682.

We will next consider the defendant's claims regarding his attorney's failure to pursue a defense based on voluntary intoxication. Voluntary intoxication may preclude the defendant from forming the malice aforethought necessary to commit murder, see *Commonwealth* v. *Sires*, 413 Mass. 292, 299 n.7 (1992), and thus could, reduce the verdict. See *Commonwealth* v. *Hardy*, 426 Mass. 725, 729 n.5 (1998). Despite the defendant's claim, in fact there was considerable focus on voluntary intoxication. The defense counsel presented evidence on the subject, requested an instruction on voluntary intoxication, and the judge instructed on it in connection with all three theories of murder in the first and second degrees. The jury rejected it. To the extent there was any reduced effort on the part of counsel on the voluntary intoxication issue, it was at the defendant's request. The judge found that defense counsel abandoned a defense of voluntary intoxication after the defendant "specifically and emphatically told him that he did not want to present a defense based upon [so-called] diminished capacity." This finding is supported not only by defense counsel's testimony at the hearing on the motion for a new trial, but by the trial transcript as well. In the midst of the trial, defense counsel

informed the judge that an intoxication defense was jettisoned specifically because the defendant insisted he did not commit the homicides and did not want any defense that would "involve an admission that he committed" the homicides. Defense counsel testified similarly at the hearing on the motion for a new trial. The defendant was present in the court room when counsel made the statement at trial and he voiced no objection to it. Nor does the defendant claim either on direct appeal or in his papers supporting his motion for a new trial that the statement was incorrect. Thus, any type of defense based on voluntary intoxication was abandoned at the defendant's insistence.

The defendant claims that his decision to reject a voluntary intoxication defense might have been different had further testing been done. But the defense provided no basis for the judge to conclude that further testing would have provided anything of value for the defense. The judge found that the defendant's doctors suggested only a " 'diagnostic possibility' of a condition that might or might not aid in a defense." Her finding indicated that the experts had not provided anything more than mere speculation that further testing would provide anything useful for the defense. This finding is supported by the evidence. Dr. Schouten testified only that further testing "*could* have shown . . . a tendency to . . . black out . . . . It *could* show . . . impulsive problems" (emphasis supplied). The judge acted within her discretion in denying the defendant's motion for a new trial.[20]

---

[20]The defendant contends that the alibi defense was not a viable one and that counsel should not have pursued it. He seeks support for his argument from *Commonwealth* v. *Haggerty*, 400 Mass. 437, 439-442 (1987). However, the *Haggerty* case is distinguishable. In that case, counsel abandoned "the only realistic defense the defendant had" because of his misunderstanding of Mass. R. Crim. P. 14 (a) (3) (A), 378 Mass. 875 (1979). *Id.* at 441. Counsel failed to investigate a causation defense based on medical testimony because, according to him, if his expert's opinion were adverse to the defendant, it might become available to the Commonwealth for use at trial. In the present case, according to the judge's well-supported findings, the defense of intoxication was abandoned at the defendant's insistence, and it was not a realistic defense.

b. *Conflict of interest.*[21] The defendant argues that his counsel had a conflict of interest because he had previously represented a defense witness, James Casello. The facts regarding this claim as found by the judge in her memorandum of decision on the motion for a new trial are as follows. Approximately one year prior to trial, the defendant's trial counsel filed a motion requesting a hearing regarding a potential conflict of interest. An ex parte hearing was held by a judge other than the trial judge. At that hearing, trial counsel informed the judge that the defendant told him that one James Casello had woken him when he was asleep on the victims' couch, whereupon the defendant saw the bodies. Casello was a potential Commonwealth witness. Trial counsel stated that he had represented Casello in a civil matter that had been settled. The defendant was questioned by the judge and stated that he had been afraid to mention Casello's involvement in the crime sooner because counsel had previously represented Casello and the defendant feared that counsel would inform Casello of the defendant's allegations. The defendant also stated to the judge that Casello and his friends were "very intimidating." The judge advised the defendant of his right to be represented by counsel with undivided loyalty. The defendant informed the judge that he was comfortable with trial counsel's continued representation. The judge concluded that there was no conflict, and the defendant agreed.

The trial judge, in denying the defendant's motion for a new

[21]The hearing on the motion for a new trial was limited to defense counsel's failure to investigate and pursue a mental health defense. The defendant claims that the judge erred by failing to include in the hearing the matters of conflict of interest, denial of his right to testify, failure to object to certain jury instructions, and failure to file requests for jury instructions. An evidentiary hearing was required if the motion and affidavits raise a substantial issue. Mass. R. Crim. P. 30 (c) (3), 378 Mass. 900 (1979). Whether a substantial issue has been raised depends on the seriousness of the matter and the adequacy of the defendant's showing. *Commonwealth* v. *Stewart*, 383 Mass. 253, 257-258 (1981). The decision to hold an evidentiary hearing on a motion for a new trial is committed to the sound discretion of the judge, *Commonwealth* v. *Licata*, 412 Mass. 654, 660 (1992), and we accord substantial deference to the judge's decision. *Commonwealth* v. *DeVincent*, 421 Mass. 64, 69 (1995). Here, it was apparent from the defendant's motion and the affidavits filed therewith that the additional claims lacked merit. Thus, no substantial issue was raised, and the judge did not abuse her discretion in deciding the portions of the motion that raised these questions on the basis of the affidavits and her familiarity with the trial. See *Commonwealth* v. *Britto*, 433 Mass. 596, 608 (2001).

trial, concluded that the defendant's trial counsel handled the potential conflict situation properly. She found that, when counsel learned that a conflict might exist due to his prior representation, he made full disclosure of this fact and explained the problem to the defendant. Cf. *Commonwealth* v. *Banister*, 428 Mass. 211, 216 (1998). She found further that the judge who held the hearing on the conflict of interest issue discussed the issue of potential conflict with both the defendant and his counsel and questioned the defendant himself on the subject, and that the defendant knowingly agreed to continue with his trial counsel's representation. She permissibly determined, in effect, that the issue had been waived.[22]

The defendant claims that if the judge had permitted a hearing on the conflict of interest question, he could have presented testimony regarding the failure of his counsel to investigate Casello as a suspect. The defendant asserted in his affidavit in support of the motion for a new trial that he agreed to trial counsel's continued representation only because trial counsel had promised to "aggressively investigate" Casello's potential culpability, but that counsel never conducted such an investigation. In her memorandum of decision on the motion for a new trial, the judge implicitly discredited this self-serving assertion. She need not credit the defendant's statements in his affidavit, see *Commonwealth* v. *Mitchell*, 438 Mass. 535, 544 n.5 (2003). Furthermore, the motion for a new trial and accompanying affidavits never indicated what such an investigation might produce. The defendant had to do more than raise a speculative theory that further investigation might have identified Casello as the killer.

c. *Denial of right to testify.* The defendant posits that his trial counsel denied him the right to testify. He first raised this claim in a letter to the judge shortly after trial ended. In ruling on the motion for a new trial, the judge found that the defendant had "never raised this issue with the court at any time during trial notwithstanding that he raised, both prior to and during the . . . trial, numerous other issues concerning counsel's repre-

---

[22]Moreover, Casello testified at trial as a partial alibi witness for the defense. There has been no showing by the defendant that Casello could have given any additional exculpatory testimony.

sentation." (These other issues included the alleged conflict of interest of counsel, his belief that he was entitled to independent blood tests and a motion to dismiss his counsel.) The defendant was present during the charge conference at which defense counsel informed the judge that he wanted an instruction on the defendant not testifying, and the judge so instructed. Despite these opportunities, the defendant, who had not previously hesitated to state his views, never voiced any concern about not being permitted to testify until the letter he wrote after his convictions. In an affidavit submitted in connection with the motion for a new trial, the defendant's trial counsel stated that he had "numerous conversations" with the defendant on this matter and that the defendant consistently, "emphatically and repeatedly [told him] that he did not want to testify." The judge's conclusion that "this claim is an after-the-fact invention" is well supported. See *Commonwealth* v. *Gill*, 37 Mass. App. Ct. 457, 468-469 (1994).[23]

d. *Jury instructions.* In his papers supporting his motion for a new trial, the defendant also alleged that his counsel was ineffective for failing to object to the allegedly erroneous jury instructions discussed previously. The judge did not resurrect these issues by discussing them substantively, see *Commonwealth* v. *Hallet*, 427 Mass. 552, 554-555 (1998), but determined that any "asserted errors did not create a substantial [likelihood] of a miscarriage of justice."

The defendant contends that he has been harmed by counsel's failure to object to these instructions. Had the objections been voiced at trial, the defendant would have received the more

---

[23]A hearing was held five days before trial at which the defendant requested the appointment of new counsel due to communication problems and counsel's failure to have certain blood tests performed. The judge discussed this issue with defendant and his counsel. The defendant now claims that counsel was ineffective for failing to request an ex parte hearing so that the Commonwealth would not be privy to these grievances. This claim lacks merit, as the defendant does not identify any prejudice flowing from these assertions.

The defendant also maintains that at this hearing his counsel improperly disclosed the "entire" defense strategy to the Commonwealth by mentioning that he had advised the defendant that the best strategy was to seek a conviction of murder in the second degree rather than an acquittal. Because the defense at trial was alibi, the defendant could not have been prejudiced by the remarks of his trial counsel.

favorable standard of review of prejudicial error (rather than the standard of a substantial likelihood of a miscarriage of justice). As to the instruction on armed assault in a dwelling as the predicate felony for felony-murder and the instruction on alibi, we have determined there was no error. Thus, there was no basis for an objection, and there can be no ineffective assistance of counsel. See *Commonwealth* v. *Dykens*, 438 Mass. 827, 839 (2003). There was an error in the second prong of malice instruction. Were we to apply the prejudicial standard of review to this error, we have stated that "[e]rror in a second . . . prong instruction is not prejudicial where the jury convicts by reason of deliberate premeditation, because deliberate premeditation necessarily requires the jury to find a specific intent to kill, which satisfies the first prong of malice." *Commonwealth* v. *Johnson*, 426 Mass. 617, 622 (1998). Because the jury, under proper instruction, found first prong malice beyond a reasonable doubt, we conclude that the conviction for deliberate premeditation is based on a proper malice determination. See *id.* Therefore, applying the more favorable standard of review on appeal, the defendant has not been prejudiced. There was no error that would have influenced the jury's conclusion.[24,25]

6. *Motions for funds.* In relation to his motion for a new trial, the defendant filed five motions for funds to hire additional mental health experts, one for each expert he sought to retain. Apparently, no action was taken on these motions and, shortly after the evidentiary hearing on his motion for a new trial, he filed five "renewed" motions for "extra fees and costs pursuant to [G. L. c. 261, § 27C]." The judge denied the motions on the ground that G. L. c. 261, § 27C, "precludes the allowance of

---

[24]Again, any error would be harmless, as the defendant was also convicted on each murder count on the alternate theories of felony-murder and extreme atrocity or cruelty. *Commonwealth* v. *Brum*, 438 Mass. 103, 119-120 n.23 (2002).

[25]Appellate counsel averred in support of the motion for a new trial that trial counsel failed to "prepare or present . . . any proposed jury instructions." The defendant has not shown any omission or error in the instructions that resulted from this alleged failure, or if there were any omission or error, how he was prejudiced thereby. In addition, trial counsel orally requested instruction on alibi and voluntary intoxication. (As to the latter, he noted that there had been evidence of the defendant's intoxication even though he had informed the judge that he was no longer pursuing "that actively as a line of defense.")

. . . funds" associated with a motion for a new trial. She also noted that the hearing on the motion for a new trial had already been conducted. There was no error. At the time of her decision, the statute allowed a judge no discretion to grant a defendant costs associated with a motion for a new trial. See *Commonwealth* v. *Carter*, 429 Mass. 266, 270 (1999) (§ 27C "does not authorize a judge to allow costs in connection with the presentation of a new trial motion based on a claim of ineffective assistance of counsel").

Thereafter, this court amended Mass. R. Crim. P. 30 (c) (5), as appearing in 435 Mass. 1501 (2001), to authorize the allowance of costs associated with new trial motions. The defendant then filed five "renewed" motions for fees. The judge denied these motions on the basis that "the defendant has not shown a likelihood that the expenditure will result in the defendant's being able to present a meritorious ground for a new trial." Again, there was no error. See Reporters' Notes to Mass. R. Crim. P. 30 (c) (5), Mass. Ann. Laws, Rules of Criminal Procedure 1458 (2003) ("In making the decision to allow costs associated with a new trial motion, the judge should take into account the likelihood that the expenditure will result in the defendant's being able to present a meritorious ground for a new trial"). The judge had presided at the defendant's trial and heard the testimony of mental health experts that the defendant suffered from no "clear cut mental illness," and she was aware that he had not wished to pursue this defense at trial, see *infra*. She had also conducted a hearing on his motion for a new trial based on his counsel's alleged failure to pursue mental health defenses and advise him in that regard. The judge was well within her discretion in denying the motions for funds.

7. *Relief pursuant to G. L. c. 278, § 33E.* After reviewing the entire record, we conclude that there is no reason to exercise our power under G. L. c. 278, § 33E, either to reduce the murder verdicts or to order a new trial.

*Judgments affirmed.*

*Order denying motion for a new trial affirmed.*