# United States Court of Appeals

## For the First Circuit

No. 06-2477

JOSEPH SLEEPER,

Petitioner, Appellant,

v.

LUIS S. SPENCER, Superintendent, M.C.I. Norfolk;
MARTHA COAKLEY, Attorney General of the Commonwealth of
Massachusetts,

Respondents, Appellees.

APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS
[Hon. Michael A. Ponsor, U.S. District Judge]

Before

Lynch and Lipez, Circuit Judges
and Barbadoro,* District Judge

William C. Newman, with whom Richard L. Goldman was on the brief, for appellant.
Eva M. Badway, Assistant Attorney General, Commonwealth of Massachusetts, with whom Martha Coakley, Attorney General, was on brief for appellee.

December 5, 2007

---

*Of the District of New Hampshire, sitting by designation.

**BARBADORO, District Judge**. Joseph Sleeper was convicted of first degree murder in Massachusetts Superior Court. The Supreme Judicial Court (SJC) affirmed Sleeper's conviction, Commonwealth v. Sleeper, 760 N.E.2d 693, 713 (Mass. 2002), and the United States District Court for the District of Massachusetts denied his petition for a writ of habeas corpus. Sleeper v. Spencer, 453 F. Supp. 2d 204, 223 (D. Mass. 2006). The sole ground certified for appeal is Sleeper's claim that he received ineffective assistance of counsel because his attorney promised in his opening statement to present an insanity defense even though he knew or should have known that the court would not allow the jury to consider the defense. The SJC confronted this argument head on, concluding that counsel's alleged promise was a misstatement rather than a broken promise and was, in any event, inconsequential. Because the SJC's determination that Sleeper suffered no prejudice is reasonable in light of controlling Supreme Court precedent, we affirm without resolving Sleeper's contention that counsel's performance was deficient.

I.

A. **The crime**

Sleeper and his wife, Victoria, separated in March 1992.[1] She filed for divorce several months later and obtained a

---

[1] We set forth only the facts relevant to this appeal. The SJC's opinion, Commonwealth v. Sleeper, 760 N.E.2d 693, 697-99 (Mass. 2002), describes the background facts in greater detail.

protective order barring Sleeper from the marital home. In August 1993, after 17 months of separation, Victoria began dating another man. Sleeper soon became aware of this new relationship.

On September 2, 1993, Victoria and her male friend left the area for a Labor Day weekend vacation. While they were away, Sleeper made numerous telephone calls and entered Victoria's home in an effort to determine her whereabouts. Victoria returned, alone, on September 6, 1993. That evening, sometime before 9:00 p.m., Sleeper confronted Victoria at home. After chasing her into the bedroom, Sleeper stabbed her at least eight times with a knife. Two of the stab wounds severed her ribs, and the deepest wound went between six and one-half and seven inches into her chest. Sleeper noticed that Victoria was still breathing but did not telephone for an ambulance. She remained conscious for approximately four to five minutes after being stabbed, and died a few minutes later.

Sleeper left Victoria's home at about 9:30 p.m. Several hours later, he entered a nearby State Police barracks and told the trooper at the front desk that he had just killed his wife. In explaining what had happened, Sleeper told the officers who questioned him that he had gone to the home to confront Victoria about her new relationship and that he had obtained the knife he used to kill her from a toolbox in her home.

## B. The trial

Sleeper's counsel filed a motion seeking funds for a

psychological examination on October 26, 1993.  In support of the motion, counsel asserted that "facts exist to substantiate a defense of either partial or total mental defect of the Defendant." The court granted the motion and counsel retained Dr. Ronald Ebert, a forensic psychologist, to examine Sleeper.  Counsel filed Dr. Ebert's report with the court on April 19, 1994.  On May 23, 1994, counsel filed requests for jury instructions that included both instructions on an insanity defense pursuant to Commonwealth v. McHoul, 226 N.E.2d 556 (Mass. 1967), and instructions on mental impairment negating the *mens rea* required for first-degree murder, pursuant to Commonwealth v. Gould, 405 N.E.2d 927 (Mass. 1980).

The trial began on May 25, 1994.  Sleeper's counsel delivered his opening statement immediately after the prosecutor's opening.  He began by conceding that "Joseph Sleeper killed his wife, he stabbed her at least eight times viciously in the chest and other parts of her body."  He then explained that, "We are not going to sit here and pretend, to play games as to who done it . . . . You're here to determine whether or not Joe Sleeper committed first degree murder, second degree murder, manslaughter, or was insane at the time he did it."  Counsel then detailed Sleeper's early adult life, his marriage to Victoria, and how he began to drink and feel that "things were coming apart in his heart" after the first time he saw his wife "with another guy in a pickup truck."  Counsel described the night of the killing from Sleeper's

perspective, describing Sleeper's mental state as "insane" and "absolutely frenzied." Counsel ended his opening statement with this request: "Put yourself in the real world, please, and then make a determination as to whether this was a premeditated and planned scheme, a first degree murder case, which it is not; or something that built in this man and drove him crazy. That is what happened."

Sleeper testified at trial. He claimed that he went to Victoria's home on the night of the crime to borrow a car from one of their sons. He also testified that he encountered Victoria outside the home and that she invited him to come inside. He admitted that they argued. When he followed Victoria into her bedroom in an effort to stop her from calling the police, he claimed he saw a condom and a knife in an open chest of drawers. At that point, Sleeper said, "Everything just went crazy. I started seeing a merry-go-round, a ferris wheel with the numbers on it . . . I grabbed the knife and I had stabbed her." After the stabbing, "I was spinning all around, I remember spinning, I remember I didn't know what to do and I went down." In short, Sleeper claimed that he was unaware of what he was doing when he killed Victoria.

Dr. Ebert testified as an expert witness for Sleeper. Dr. Ebert opined that Sleeper was a long-time alcoholic and was suffering from an acute state of depression with psychotic

features. Although Dr. Ebert acknowledged that Sleeper was not insane, he opined that Sleeper had a "diminished capacity" to act with criminal intent when he killed Victoria.

Dr. Wesley Profit, then the director of forensic services at Bridgewater State Hospital, offered expert rebuttal testimony. Dr. Profit opined that Sleeper was not suffering from any major mental illness, that he did not lack criminal responsibility at the time of the killing, and that he had the ability to harbor malice. On cross-examination, however, he conceded that he had not formed an opinion as to whether Sleeper suffered from "a diminished capacity."

During the charge conference after the conclusion of the evidence, the court agreed to provide instructions regarding counsel's mental impairment defense. Sleeper's counsel requested an insanity instruction notwithstanding the expert testimony, but the court denied this request.

In his closing statement, Sleeper's counsel began, "We are not asking you to make a determination as to whether or not Joseph Sleeper stabbed his wife eight times in the heart . . . what you're going to have to determine is the state of mind Joseph Sleeper was in at the time." Counsel emphasized, "this is not a first degree murder case . . . . This is the act of someone that was in a frenzy, that had a diminished capacity of intent." He contrasted the testimony of Dr. Ebert and Dr. Profit, emphasized

Dr. Ebert's opinion that "there was a diminished capacity in this man's intent to perform premeditation and his intent to perform malice," and noted that Dr. Profit had not contradicted Dr. Ebert's opinion on diminished capacity. After discussing Sleeper's relationship with Victoria and the events on the night he killed her, counsel returned to the psychological testimony and again repeated Dr. Ebert's conclusions and credentials.

The court instructed the jury that it could convict Sleeper of first degree murder if Sleeper committed either premeditated murder or murder with extreme atrocity or cruelty. It also instructed on the lesser included offenses of second degree murder and voluntary manslaughter. Over the Commonwealth's objection, the court informed the jury that it could consider evidence of Sleeper's mental state at the time of the offense in determining whether he acted with the *mens rea* required for either first or second degree murder. The court also instructed the jury on Sleeper's claim that he was at most guilty of manslaughter because he committed the crime in the heat of passion with adequate provocation.

The jury ultimately convicted Sleeper of first degree murder because it determined that he acted with premeditation. It, however, rejected the Commonwealth's contention that Sleeper was also guilty of committing the murder with extreme atrocity or cruelty.

## C.    __The Appeal__

Sleeper appealed his conviction directly to the SJC, asserting twenty-nine assignments of error.  As to ineffective assistance, Sleeper argued that his trial counsel was ineffective because counsel improperly promised that he would present an insanity defense in his opening statement even though he knew or should have known that no evidence would be introduced to support that defense.  The SJC reviewed his claim under the ineffective assistance of counsel standard it uses on direct review of first degree murder cases: "whether there was an error in the course of the trial (by defense counsel, the prosecutor, or the judge) and, if there was, whether that error was likely to have influenced the jury's conclusion."    Sleeper, 760 N.E.2d at 710 (quoting Commonwealth v. Wright, 584 N.E.2d 621, 624 (Mass. 1992)).  Using this standard, the SJC held that Sleeper's counsel was not ineffective.  Id. at 711.  Although the court found that counsel "no doubt misspoke" when he informed the jury that it would be asked to consider whether Sleeper was "insane," the court held that the misstatements did not amount to a broken promise; counsel's references to insanity were consistent with his argument that Sleeper suffered from mental impairments that negated the *mens rea* required for a first degree murder conviction.  Id.  For similar reasons, the court concluded both that "[i]n the context of the entire trial, counsel's statement was inconsequential" and "no

-8-

reasonable juror would feel 'disappointed' by the defense."  <u>Id.</u>

## D.  **The federal habeas corpus petition**

Sleeper subsequently filed a petition for habeas corpus in the United States District Court for the District of Massachusetts, asserting six different grounds for relief.  As to ineffective assistance, the district court rejected Sleeper's arguments that the SJC failed to fully adjudicate Sleeper's federal claim on the merits.  <u>Sleeper</u>, 453 F. Supp. 2d at 219.  Although conceding that the question before the SJC was a close one, the district court then dismissed Sleeper's ineffective assistance claim because it determined that the SJC's analysis was not objectively unreasonable.  <u>Id.</u> at 222.

On November 30, 2006, the district court issued a Certificate of Appealability (COA).  The sole claim certified for appeal was Sleeper's ineffective assistance of counsel claim.

II.

## A.  **AEDPA**

This case is governed by the standards of review established by the Anti-Terrorism and Effective Death Penalty Act (AEDPA), 28 U.S.C. § 2254, and the well-established <u>Strickland</u> test for ineffective assistance of counsel claims.  <u>Strickland</u> v. <u>Washington</u>, 466 U.S. 668, 687 (1984).  We briefly review the relevant law in both areas before turning to the merits of Sleeper's claim.

-9-

Under AEDPA, if a state court has adjudicated a habeas petitioner's claim on the merits, a federal court may issue the writ only if the state court's adjudication resulted in a decision that "was contrary to" clearly established federal law, involved an "unreasonable application" of clearly established federal law, or was based on an "unreasonable determination of the facts in light of the evidence presented." 28 U.S.C § 2254(d).

A state court's decision is contrary to clearly established federal law if the state court arrives at a conclusion opposite from that reached by the U.S. Supreme Court on a question of law, or if the state court decides the case differently than the U.S. Supreme Court has on a set of materially indistinguishable facts. Williams v. Taylor, 529 U.S. 362, 405 (2000).

A state court's decision unreasonably applies clearly established federal law if the state court correctly identifies the governing legal principles, but (i) applies those principles to the facts of the case in an objectively unreasonable manner; (ii) unreasonably extends clearly established legal principles to a new context where they should not apply; or (iii) unreasonably refuses to extend established principles to a new context where they should apply. L'Abbe v. DiPaolo, 311 F.3d 93, 96 (1st Cir. 2002) (citing Williams, 529 U.S. at 407). If the state court does not expressly apply the federal standard but resolves the issue under a state law standard that is more favorable to defendants than the federal

standard, then the reviewing court "will presume the federal law adjudication to be subsumed within the state law adjudication." Teti v. Bender, __ F.3d __, 2007 WL 3293523, at *3 (1st Cir. Nov. 8, 2007) (quoting McCambridge v. Hall, 303 F.3d 24, 35 (1st Cir. 2002)). To be unreasonable, the state court's application of existing legal principles must be more than merely erroneous or incorrect. Williams, 529 U.S. at 411. "We agree with the Second Circuit that 'some increment of incorrectness beyond error is required.' Francis S. v. Stone, 221 F.3d 100, 111 (2d Cir. 2000). The increment need not necessarily be great, but it must be great enough to make the decision unreasonable in the independent and objective judgment of the federal court." McCambridge, 303 F.3d at 36.

In reviewing a habeas corpus petition under AEDPA, a federal court will presume that the state court's findings of fact are correct. For this purpose, the term "facts" refers to "basic, primary, or historical facts," such as witness credibility and recitals of external events. Sanna v. DiPaolo, 265 F.3d 1, 7 (1st Cir. 2001) (quoting Bryson v. Ward, 187 F.3d 1193, 1211 (10th Cir. 1999)). The habeas petitioner may defeat the presumption of correctness only with clear and convincing evidence to the contrary. 28 U.S.C. § 2254(e)(1); see also Ouber v. Guarino, 293 F.3d 19, 27 (1st Cir. 2002). The presumption of correctness is equally applicable when a state appellate court, as opposed to a

-11-

state trial court, makes the findings of fact. Norton v. Spencer, 351 F.3d 1, 6 (1st Cir. 2003) (quoting Sumner v. Mata, 455 U.S. 591, 593 (1982)).

## B. Ineffective assistance of counsel

The Supreme Court has explained that an ineffective assistance of counsel claim requires both deficient performance and prejudice. Strickland, 466 U.S. at 687.

To establish that counsel's performance was deficient, a defendant must show that it fell below an objective standard of reasonableness under the circumstances. Id. at 687-88. This is a highly deferential review, making every effort to "eliminate the distorting effects of hindsight." Id. at 689. As the Supreme Court emphasized in Yarborough v. Gentry, the "Sixth Amendment guarantees reasonable competence, not perfect advocacy judged with the benefit of hindsight." 540 U.S. 1, 8 (2003). When examining counsel's conduct, the court considers the facts of the particular case from counsel's perspective at the time. Strickland, 466 U.S. at 690. Counsel has "wide latitude in deciding how best to represent a client," Gentry, 540 U.S. at 5-6, and benefits from a strong presumption that he or she rendered adequate assistance and exercised reasonable professional judgment in making all significant decisions. Strickland, 466 U.S. at 690.

To establish prejudice, the defendant must show that, but for counsel's unprofessional error, there is a reasonable

-12-

probability that the result of the proceeding would have been different.  See Wiggins v. Smith, 539 U.S. 510, 537 (2003) (finding prejudice where there was a "reasonable probability that at least one juror would have struck a different balance"); Strickland, 466 U.S. at 694.  A reasonable probability is a probability sufficient to undermine confidence in the outcome.  Strickland, 466 U.S. at 694.

III.

Although Sleeper must prove both deficient performance and prejudice to prevail on his ineffective assistance of counsel claim, a reviewing court need not address both requirements if the evidence as to either is lacking.  As the Supreme Court has recognized, "[i]f it is easier to dispose of an ineffectiveness claim on the ground of lack of sufficient prejudice, which we expect will often be so, that course should be followed."  Strickland, 466 U.S. at 697.  We take this path here and address only Sleeper's claim of unfair prejudice, leaving unresolved both his argument that the SJC erred in finding that counsel's references to insanity were mere misstatements and his contention that counsel's performance was deficient.  We begin by explaining why the SJC's no-prejudice ruling is entitled to AEDPA deference and then turn to Sleeper's specific challenges to the SJC's ruling.

## A.   AEDPA Deference

Sleeper argues that the SJC's no-prejudice ruling should

be reviewed *de novo* for two related reasons.  First, he asserts that deference is unwarranted because the SJC analyzed his ineffective assistance of counsel claim under a state law standard that fails to satisfy the requirements of federal law.  In the alternative, he argues that *de novo* review is required even if the SJC used an acceptable legal standard because the court did not engage in a fully developed prejudice analysis.  Neither argument has merit.

The SJC reviewed Sleeper's ineffective assistance of counsel claim by asking "whether there was an error in the course of the trial (by defense counsel, the prosecutor, or the judge) and, if there was, whether that error was likely to have influenced the jury's conclusion."  Sleeper, 760 N.E.2d at 710 (quoting Commonwealth v. Wright, 584 N.E.2d 621, 624 (Mass. 1992)).  Because this court has previously determined that the standard used by the SJC in analyzing Sleeper's claim is at least as protective of defendants as the federal ineffective assistance of counsel standard, see Horton v. Allen, 370 F.3d 75, 86 (1st Cir. 2004), cert. denied, 543 U.S. 1093 (2005), "we will presume the federal law adjudication to be subsumed within the state law adjudication." Teti, 2007 WL 3293523, at *4 (quoting McCambridge, 303 F.3d at 35).  Accordingly, there is no merit to Sleeper's claim that the SJC based its analysis of the prejudice question on an insufficiently

protective legal standard.[2]

Sleeper's alternative argument is also unavailing. Although the SJC analyzed Sleeper's claim by focusing primarily on the adequacy of counsel's performance, it also specifically addressed the issue of prejudice, finding that "in the context of the entire trial, counsel's statement [that Sleeper was insane] was inconsequential." Sleeper, 760 N.E.2d at 710-11. The court further explained its determination by noting that counsel's references to insanity were not problematic because they were "reasonably predictive of the trial that unfolded." Id. at 711. This analysis is sufficiently developed to entitle the SJC's no-prejudice determination to AEDPA deference.

## B. Prejudice

The Supreme Court has not identified the circumstances under which an ineffective assistance of counsel claim may be premised on a broken promise in an opening statement. This court, however, has invalidated convictions because of broken promises in

---

[2] Sleeper mistakenly relies on Lynch v. Ficco, 438 F.3d 35 (1st Cir. 2006) for the proposition that the SJC based its no-prejudice determination on a state law standard that is less protective of defendants than the federal ineffective assistance of counsel standard. Although the Lynch court reviewed the claim that was before the court under a *de novo* standard of review, it did so in part because "the SJC did not purport to do an ineffective assistance analysis . . . ." Id. at 48. In this case, in contrast, the SJC specifically analyzed Sleeper's claim using an ineffective assistance of counsel test that this court has determined is at least as protective of defendants as the federal standard. Horton, 370 F.3d at 86; Mello v. DiPaulo, 295 F.3d 137, 144 (1st Cir. 2002)

Anderson v. Butler, 858 F.2d 16 (1st Cir. 1988), United States v. Gonzalez-Maldonado, 115 F.3d 9 (1st Cir. 1997), and Ouber v. Guarino, 293 F.3d 19 (1st Cir. 2002). Sleeper relies on all three decisions in arguing that the SJC's no-prejudice ruling represents an unreasonable application of Supreme Court precedent.[3]

In Anderson, counsel promised in his opening statement to call two expert witnesses (a psychiatrist and a psychologist). Anderson, 858 F.2d at 17. The experts, counsel stated, would opine that the defendant was "walking unconsciously toward a psychological no exit . . . like a robot programmed on destruction," when he killed his wife. Id. The next day, counsel rested on the basis of lay witness testimony alone, without calling the promised experts. Id. In concluding that counsel's broken promise had irreparably damaged the defense case, the court reasoned that "[t]he first thing that the ultimately disappointed jurors would believe, in the absence of some other explanation, would be that the doctors were unwilling, viz., unable, to live up to their billing. This they would not forget." Id. at 17.

In Gonzalez-Maldonado, counsel relied on the trial court's pretrial ruling allowing a defense psychiatrist to testify

---

[3] This court also considered the subject of broken promises in United States v. McGill, 11 F.3d 223 (1st Cir. 1993) and Phoenix v. Matesanz, 233 F.3d 77 (1st Cir. 2000). In both cases, however, the court did not address the prejudice prong of the ineffective assistance test because it determined that counsel's conduct was justified under the circumstances.

when counsel promised the jury that he would produce psychiatric testimony regarding the defendant's mental illness. Gonzalez-Maldonado, 115 F.3d at 14. During the presentation of the defendant's case, however, the court reconsidered its prior ruling and decided that the psychiatrist would not be permitted to testify. Id. On appeal, this court held that the trial court's whiplash-inducing series of rulings constituted reversible error. Id. at 15. Although the case did not present an ineffective assistance claim, this court relied on Anderson in holding that the defendant was prejudiced by counsel's broken promise to admit the psychiatric evidence. Id. Explaining its conclusion, the court noted, "[i]f the defense fails to produce promised expert testimony that is critical to the defense strategy, a danger arises that the jury will presume that the expert is unwilling to testify and the defense is flawed." Id. at 15.

In Ouber, counsel promised four times in his opening statement that the defendant would testify, and he underscored the importance of the anticipated testimony by stating that it was the centerpiece of the case: "The case is going to come down to what happened in that car and what your findings are as you listen to the credibility and the testimony of Todd Shea versus what your findings are as you listen to the testimony of [defendant] Barbara Ouber." Ouber, 293 F.3d at 22. On the evening of the first day of trial, counsel persuaded the defendant not to testify. Id. at 24.

-17-

In concluding that counsel's broken promise was prejudicial, the court reasoned that "counsel's belated decision not to present the petitioner's testimony sabotaged the bulk of his efforts prior to that time (and, in the process, undermined his own standing with the jury, thereby further diminishing the petitioner's chances of success)." Id. at 34.

The present case differs materially from Anderson, Gonzalez-Maldonado, and Ouber because Sleeper's claim is premised on counsel's alleged breach of a promise to present an additional defense rather than a promise to provide specific testimony from a particular witness. A breached promise to present specific evidence can injure because it invites speculation that the omitted evidence would have harmed an otherwise viable defense. Anderson, 858 F.2d at 17. In contrast, an unfulfilled promise to present an additional defense ordinarily will not impair counsel's ability to proceed with the remaining defenses. Id. at 19.

Sleeper nevertheless challenges the SJC's no-prejudice ruling because he claims that counsel's promised insanity defense was inconsistent with the defenses that ultimately were submitted to the jury. We hold that the SJC did not act unreasonably in concluding otherwise. Sleeper presented two defenses: mental impairment negating the *mens rea* required for first degree murder[4]

---

[4] Sleeper faults his counsel for presenting a "diminished capacity defense" that he claims Massachusetts law does not recognize. This criticism is unwarranted. Although the SJC

-18-

and reasonable provocation preventing a conviction for either first or second degree murder. Neither defense was significantly damaged by counsel's alleged promise of an insanity defense.

Every statement that counsel made in his opening statement concerning Sleeper's mental state at the time of the crime was consistent with Sleeper's mental impairment defense. At most, jurors might have faulted counsel for overreaching. Such overreaching, however, while generally inadvisable, will rarely produce significant prejudice if it consists merely of a broken promise to present a complete defense when only a consistent partial defense is supportable. Accordingly, the SJC had sufficient grounds for its conclusion that "no reasonable juror would feel 'disappointed'" by the mental impairment defense that Sleeper actually presented. Sleeper, 760 N.E.2d at 711.

---

declines to use "diminished capacity" as a label for the state's mental impairment defense, see, e.g., Commonwealth v. Candelario, 848 N.E.2d 769, 776 (Mass. 2006), it has consistently recognized that mental impairment can prevent a defendant from acting with premeditation, extreme atrocity and cruelty, intent, and knowledge. See, e.g., Commonwealth v. Murphy, 813 N.E.2d 820, 825 n.4 (Mass. 2004). See generally Katherine E. McMahon, Murder, Malice and Mental State: A Review of Recent Precedent Recognizing Diminished Capacity from *Commonwealth* v. *Greg* to *Commonwealth* v. *Sama*, 78 Mass. L. Rev. 40 (1993) (collecting cases). In the present case, the trial court appropriately instructed the jury that it could consider whether Sleeper suffered from a mental impairment that prevented him from acting with the *mens rea* required for a murder conviction. Further, it is clear from the record that counsel merely used the term "diminished capacity" in his remarks to the jury to refer to his mental impairment defense. Thus, counsel did not ask the jury to consider a defense that Massachusetts law does not recognize.

Sleeper's argument that counsel's references to a possible insanity defense undermined his reasonable provocation defense fares no better. Sleeper bases his argument on case law recognizing that provocation is a viable defense to murder only when "a reasonable person would have become sufficiently provoked and would not have 'cooled off' by the time of the homicide . . . ." Commonwealth v. Acevedo, 845 N.E.2d 274, 283 (Mass. 2006) (quoting Commonwealth v. Groome, 755 N.E.2d 1224, 1240 (Mass. 2001)). Working from this foundation, Sleeper argues that counsel's references to insanity conflicted with his provocation defense because these references made it more difficult to establish the objective prong of provocation (i.e., that a reasonable person in Sleeper's position would have been provoked). This argument is flawed on two counts. First, Sleeper cannot show that but for counsel's references to insanity, he would not have suffered the claimed prejudice. The claimed prejudice stems as much from counsel's reasonable strategic decision to present a mental impairment defense as it does from his allegedly broken promise of an insanity defense. In any event, Sleeper is simply wrong in suggesting that an insanity defense is necessarily incompatible with his provocation defense. Evidence that a defendant is easily provoked because he suffers from a mental illness does not prevent the defendant from arguing that a reasonable person would have responded in the same way.

-20-

In a last-ditch effort to prove prejudice, Sleeper argues that counsel's broken promise of an insanity defense harmed him because it opened the door to otherwise inadmissible consciousness of guilt evidence and adverse psychological opinion testimony from the Commonwealth's expert. This argument lacks merit. The SJC reasonably determined that the consciousness of guilt evidence was admissible to establish Sleeper's identity as the killer. Sleeper, 760 N.E.2d at 707-08. We see no reason to question this determination. Moreover, both the consciousness of guilt evidence and the Commonwealth's psychological evidence were independently admissible in response to Sleeper's mental impairment defense. Thus, counsel's references to insanity did not open the door to the introduction of otherwise inadmissible evidence.

IV.

Counsel faced a daunting task in defending Sleeper. His client had confessed to a gruesome killing and his reasonable provocation defense was problematic, both because its factual predicate was undermined by Sleeper's own statements to the police, and because it is difficult to see how a reasonable person could have been provoked into the heat of passion even if events unfolded as Sleeper claimed at trial. Under these circumstances, Sleeper's best defense was to argue that his actions were the product of a mental impairment. If counsel promised more than he could deliver on that score, his promise did not undermine any viable defense or

open the door to otherwise inadmissible evidence.  Accordingly, we find no support in the record for Sleeper's challenge to the SJC's no-prejudice ruling.

The district court's ruling dismissing Sleeper's habeas corpus petition is **<u>affirmed</u>**.