# United States Court of Appeals

## For the First Circuit

No. 07-1613

GERALD MALONE,

Petitioner, Appellant,

v.

HAROLD W. CLARKE,[*]

COMMISSIONER, MASSACHUSETTS DEPARTMENT OF CORRECTIONS,

Respondent, Appellee.

———————

APPEAL FROM THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF MASSACHUSETTS

[Hon. Rya W. Zobel, U.S. District Judge]

———————

Before

Lynch, Chief Judge,

Tashima,[**] Circuit Judge,

and Lipez, Circuit Judge.

———————

Derege B. Demissie, Demissie & Church, for petitioner-appellant.

Eva M. Badway, Assistant Attorney General, Criminal Bureau, with whom Martha Coakley, Attorney General of Massachusetts, was on brief for respondent-appellee.

———————

August 1, 2008

———————

———————

[*] Pursuant to Fed. R. App. P. 43(c)(2), Harold W. Clarke has been substituted for his predecessor Kathleen M. Dennehy, as Commissioner of the Massachusetts Department of Corrections.

[**] Of the Ninth Circuit, sitting by designation.

**TASHIMA**, **Circuit Judge**.  Gerald Malone was convicted in Massachusetts Superior Court of rape and abuse of a child under sixteen, and indecent assault and battery of a child under fourteen, based on a series of sexual assaults that he committed against his daughter when she was between the ages of eleven and fourteen.  After exhausting his state court remedies, Malone petitioned for federal habeas relief pursuant to 28 U.S.C. § 2254.  Malone alleged that his trial counsel was constitutionally ineffective for failure to subpoena a police officer who could have impeached the testimony of his daughter, who we refer to as "K.M.," the principal witness against him.  The district court denied the petition.  Because we conclude that the Massachusetts Appeals Court's decision that Malone suffered no prejudice from his counsel's failure to subpoena the witness was neither contrary to, nor an unreasonable application of, clearly established federal law, we affirm the district court's denial of Malone's habeas petition.

I.

Brenda and Gerald Malone were married and have two children together, "K.M." and Whitney.  On July 20, 1999, as they often did, Gerald and Brenda argued.  Following the argument on this occasion, however, Brenda informed Gerald Malone ("Malone") that she no longer wanted to be his wife, that she had consulted with a divorce

attorney, and that she wanted him to move out of their house. After Malone packed his belongings and left the house, K.M. told her mother that her father had been raping her for nearly four and a half years.

Upon hearing this, Brenda took K.M. to the South Yarmouth Police Department. There, K.M. was interviewed by Officer Cheryl Nugent Gomsey. Gomsey prepared an initial report which contained K.M.'s statements regarding her father's sexual assaults. On October 26, 1999, Gomsey conducted a follow-up interview and prepared an additional report. In August 1999, Malone was indicted on charges of raping and assaulting K.M.

At trial, the Commonwealth's case consisted of the testimony of K.M., her younger sister Whitney, and Brenda. K.M. was the main witness and she provided a vivid account of years of repeated rapes and sexual assaults by her father.[1] K.M. began with the first incident (which occurred in 1995), telling the jury that when she was 11 years old, her father called her into her mother's bedroom - Malone and Brenda lived apart at that time, but Malone regularly visited -- and asked K.M. if she could "do him a favor." K.M. testified that Malone was lying on the bed and a pornographic movie was playing on the television. He pulled the covers off of

_____

[1] Because this case turns on whether Malone was prejudiced by his counsel's failure to call Officer Gomsey and counsel's alleged subsequent failure to impeach K.M., it is necessary to describe K.M.'s testimony in some detail in order properly to assess the prejudice issue.

himself, exposing his naked body to his daughter. Malone, referring to his penis, told K.M. that he needed her to "suck this" for him. K.M. did as she was told, but while performing fellatio, she accidentally bit Malone's penis. Malone hit her on the head, telling her "Don't bite my shit again." K.M. continued performing oral sex until Malone ejaculated.

K.M. testified about other assaults. The second occurred about a week or two after the first. K.M. testified that she came home from school, and Malone was sitting in the living room. Upon hearing his daughter come home, he called for her. Malone asked her, "Remember that favor I asked you to do a long time ago?" K.M. remembered, but said, "I thought I didn't have to do this anymore, Daddy." To this Malone responded, "I changed my mind." Being afraid, K.M. said okay. Malone unzipped his pants, removed his penis, and ordered K.M. to perform oral sex on him, which she did.

K.M. testified to another assault which occurred shortly before her twelfth birthday. This time, Malone called K.M. into her mother's bedroom. Malone reminded her of their family "tradition" of renting a limousine for the children's twelfth birthdays -- Malone had rented a limousine for K.M.'s older sister (who we gather is not Malone's child) when she turned 12 and, at that time, he told the other two children that they would get the same thing on their twelfth birthdays. In the bedroom, however, Malone told K.M. that if she wanted her limousine she would "have

- 4 -

to earn it." K.M. testified that she understood what her father had in mind. He offered to let her "do it" after her birthday, but K.M. said no, preferring to "do it" then. Malone ordered her to take off all her clothes and perform oral sex on him. Malone then performed oral sex on her and had intercourse with her.

In June 1997, Brenda and Malone married, and, a few months before the wedding, Malone moved in with Brenda, K.M., and Whitney. K.M. testified to another sexual assault which occurred during this period. This assault occurred after K.M had gotten into trouble for being out too late. According to K.M., Malone picked her up and drove her back home. Once they returned home, Brenda "started hollering and screaming at" her. Malone and Brenda quarreled for a time, with Malone telling Brenda to leave K.M. alone. Malone and K.M. eventually left in his car. In the car, Malone told her that she could "redeem" herself, saying that she had the chance to get out of trouble. They drove off, and, while Malone was driving, he unzipped his pants and said, "Here." K.M. performed oral sex on Malone while he was driving. Malone eventually pulled the car over, and K.M. continued the oral sex until Malone finished. When asked why she never told anyone what was happening, K.M. testified that Malone told her that if she told anyone about what was going on, he would kill her.

In August 1998, when K.M. was around thirteen years old, Brenda, K.M, Whitney, and Malone moved into the house of Malone's

brother, Tony, or "Uncle Tony" as K.M. referred to him.  K.M. testified that many instances of sexual abuse occurred at Tony's house.  On one occasion, K.M. came home from school with a bad progress report and showed it to Malone, who responded angrily to the news and asked why the report was poor.  She told Malone that she was doing the best she could, but he accused her of lying.  He ordered her to "drop her drawers," which K.M. testified meant that he wanted her to take everything off from the waist down.  Malone then began to beat her with his belt, stopping only after he noticed that his brother had pulled his vehicle into the driveway.

K.M. testified about another assault at Tony's house.  This one occurred after K.M. came home from school and Malone confronted her with news that K.M.'s school had called to tell him that she had received detention because she was talking in class and being disruptive.  Malone became angry and began beating her with a belt.  Malone told her that she "had a chance to redeem herself."  K.M. performed oral sex on Malone, but because she was crying, she twice accidentally bit his penis.  This made Malone angry, which resulted in him beating and raping her.

K.M. testified regarding another sexual assault, one almost discovered by Brenda.  That time, Malone thought that Brenda had left the house and ordered K.M. to perform oral sex on him, with which she complied.  Brenda, however, was having car trouble and returned to the house.  Brenda entered her and Malone's bedroom,

- 6 -

and K.M. jumped up and her father quickly covered himself. Her mother asked what was going on, but both denied anything untoward.

In around October 1998, K.M., Brenda, and Whitney moved in with an aunt and her family. K.M. testified about another assault, which, according to K.M.'s testimony, occurred on Christmas Day 1998. On that day, K.M. was opening presents and playing with her sister when Brenda informed K.M. that her father was coming to pick up her and Whitney. K.M. protested, telling her mother that she didn't want to go. She cried and begged her mother not to make her go with her father, but Brenda denied her pleadings. When Malone picked her up, he confronted his daughter about her apprehension about seeing him. He was angry, grabbed her, hit her in the face, and smashed her head against the car window. Once at her uncle's house, Malone told Whitney to leave him and K.M. alone. Malone again demanded oral sex, with which K.M. complied, after which he raped her.

K.M. testified to other assaults, which included the playing and viewing of pornographic videos while Malone received oral sex from K.M., raped her, or both. K.M. testified that she had seen pornographic tapes with her father on seven or eight occasions, and that, all told, he had assaulted her "many times."

Finally, K.M. testified about the events of July 20, 1999. After the argument in which Brenda informed Malone of her desire to have him leave the home, Malone called his daughters from their

bedrooms. He took them to Friendly's Restaurant to "sa[y] good-bye." Once there, Malone gave Whitney some money to get something to eat in the restaurant, but Malone and K.M. stayed in the car. Malone asked K.M. if she was going to tell Brenda about the sexual abuse. K.M. told him that she was indeed going to tell Brenda. Malone responded to this by offering to give his pager to K.M. if she would remain quiet for at least twenty-four hours. He then asked whether she would remain quiet for three weeks if he gave her his cell phone. Then he offered to give her $3,000 every three months for the rest of her life if she agreed to remain silent. K.M. took the pager and cell phone and then went home. At home, she told her mother that Malone had been raping her for almost four and a half years.

On cross-examination, Malone's counsel sought to establish that K.M. had animus toward Malone because he was, in the words of the defense, a "strict disciplinarian." In an effort to undermine K.M.'s credibility, defense counsel also focused on inconsistencies or omissions between K.M.'s trial testimony and the statements she made to Officer Gomsey, as those statements were recorded in Gomsey's two police reports. Gomsey's reports were not entered into evidence, but defense counsel used the reports to refresh K.M.'s memory when, during her testimony, she expressed uncertainty about the contents of the reports or when her testimony was inconsistent with the statements that she had made to Gomsey.

K.M., according to defense counsel, had told Gomsey that Tony never came home during an assault, yet she testified that Tony came home during one of the assaults. On cross-examination, K.M. denied telling Gomsey that Tony came home while Malone was committing a sexual assault, but testified that she told Gomsey that he came home during a physical assault. Defense counsel questioned K.M. about whether she had told Gomsey that the Christmas assault had in fact occurred the day after Christmas. K.M. acknowledged that she was "not good with remembering exactly what [she] said," but insisted that she did not remember telling Gomsey that the sexual assault had occurred the day after Christmas. Counsel challenged K.M.'s testimony that Malone was unclothed when Brenda walked in on them; she testified on cross that she didn't remember whether she told Gomsey that Malone was unclothed. After viewing Gomsey's report to refresh her memory, K.M. then denied telling Gomsey that Malone was clothed.

Defense counsel further challenged K.M. with Gomsey's report. K.M., in her direct testimony, stated that Malone had given her his pager for one day of silence and his cell phone for three weeks of silence, but Gomsey's police report stated that K.M. said that Malone offered K.M. the pager for one week of silence and the cell phone for three months of silence. During cross-examination, K.M. denied telling Gomsey anything inconsistent with her testimony in this regard.

The defense challenged K.M. with other omissions or inconsistencies. K.M., on direct, testified that Malone promised her $3,000 every three months if she kept quiet forever, although there was no mention of the $3,000 payments in Gomsey's two reports. During cross-examination, K.M. testified that she did tell Gomsey about the $3,000. K.M. testified that during the very first incident of sexual abuse a pornographic tape was playing; Gomsey's reports fail to mention the pornographic tape. During cross-examination, K.M. again testified that a pornographic tape had been playing during the first incident, and she insisted that she had told Gomsey about it.

After K.M. finished testifying, the Commonwealth revealed that their second witness, Brenda, would be their only fresh-complaint witness.[2] Although the Commonwealth listed several fresh complaint witnesses, including Gomsey, at a pretrial hearing, the trial judge

---

[2] Under Massachusetts law at the time of Malone's trial, the "fresh complaint" doctrine provided "an exception to the usual rule that a prior statement of a witness that is merely repetitive of the witness's trial testimony is not admissible except in limited circumstances, such as on redirect examination to rehabilitate the witness after impeachment on a claim of recent contrivance." See Commonwealth v. King, 834 N.E.2d 1175, 1187-90 (Mass. 2005) (discussing the history and application of the fresh complaint doctrine). The doctrine allows the prosecution to rebut any inference that the alleged victim of a sexual assault is fabricating evidence by allowing evidence from a "fresh complaint" witness that the victim did, in fact, complain while the assault was still "fresh."

limited the Commonwealth's fresh complaint witnesses to one.[3]

Brenda, as the fresh complaint witness, testified about K.M. telling her that Malone had been raping her for four and a half years. Brenda testified that K.M. had told her that Malone "was making her have sex with him."

In addition to serving as the fresh complaint witness, Brenda testified to two events which supported K.M.'s testimony. First, Brenda testified that she had in fact come into her bedroom and saw Malone and K.M. in bed together and that the instant she opened the door, K.M. jumped out of bed. Brenda testified that K.M. denied that anything improper was taking place. Second, Brenda testified that on another occasion she had come home from work and entered her bedroom to find Malone holding a belt and standing over K.M., who was bent over crying and completely unclothed with a pair of

---

[3] At the time of Malone's trial it was generally a trial judge's practice to limit the number of fresh complaint witnesses, but the judge had the discretion to allow more than one fresh complaint witness. However, in King, 834 N.E.2d at 1197-98, the Massachusetts Supreme Judicial Court ("SJC") adopted a fresh complaint rule that now, as a general matter, limits such testimony to one witness — the first person told of the assault, see id. at 1198 (allowing a judge, in limited circumstances, to permit the testimony of a fresh complaint witness who was not the first person told of the assault where, for example, the "first person told of the alleged assault is unavailable, incompetent, or too young to testify meaningfully"). The changes in the Massachusetts fresh complaint doctrine apply prospectively to only those sexual assault cases tried after the issuance of the opinion. See id. at 1201. Malone's trial occurred prior to King's one fresh complaint witness rule.

socks stuffed in her mouth.[4]  Brenda testified that when she asked Malone why he was spanking K.M. completely naked and why K.M. had a sock in her mouth, Malone stated that the sock was necessary to keep K.M. from screaming.  After Brenda testified, the first day of the trial concluded.

On the second morning of the trial, defense counsel requested a continuance to serve Officer Gomsey with a subpoena to appear and testify as a defense witness.  Defense counsel explained that he thought that the Commonwealth was going to call Gomsey as a fresh complaint witness in its case-in-chief and therefore failed to serve her with a subpoena.  The court denied the continuance, concluding that the fresh complaint witnesses had been limited to one and it was apparent at the close of the previous day's proceedings that the Commonwealth was not going to call Gomsey.

Following that, the Commonwealth called Whitney, who corroborated some of K.M.'s testimony regarding what happened at Friendly's.  Whitney also testified to seeing bruises on K.M.'s thighs, and seeing the door closed on the bedroom while K.M. and Malone were inside.  The Commonwealth then rested.  Defense counsel renewed his request for a continuance to subpoena Gomsey, but the trial judge again denied the request.

---

[4]    Brenda also testified about other physical abuse, stating that she had seen bruises on K.M.'s thighs and buttocks, and had witnessed Malone hitting K.M. with a belt.

The defense called Malone's mother Kelli, who testified to conversations she had with Malone about moving to Michigan, and then the defense called Malone himself. Malone acknowledged that, in his words, he "disciplined" K.M. with "whoopings," which included beatings with a belt, but denied having any sexual relations with his daughter. Malone also testified to K.M.'s animosity toward him, which he believed flowed from his "disciplin[ing]" ways. On cross-examination, Malone admitted to beating his naked daughter while she had socks stuffed in her mouth, as well as to other physical assaults. With that, the defense rested.

Defense counsel then made an offer of proof, describing the eight alleged inconsistencies that would have been brought to light had he been allowed to subpoena Gomsey: (1) K.M. testified that Tony came home during a sexual and physical assault that occurred while she was living at her Uncle Tony's house, whereas Gomsey's report states that Uncle Tony came home during an incident in which Malone was "beating" K.M.; (2) K.M. testified that she had been raped and assaulted by Malone on Christmas Day 1998, whereas the report stated that K.M. had only been physically assaulted on that occasion; (3) regarding the incident where Brenda nearly caught Malone and K.M. in a sexual act, K.M. testified that Malone was unclothed when her mother walked in on K.M and Malone, whereas the report stated that Malone was clothed during this incident; (4)

K.M. testified that Malone had given her his pager for one day of silence and his cell phone for three weeks of silence, whereas the report stated that Malone offered K.M. the pager for one week of silence and the cell phone for three months of silence; (5) K.M. testified that Malone promised her $3,000 every three months if she kept quiet forever, whereas the reports do not mention the $3,000; (6) K.M. testified that during the very first incident of sexual abuse a pornographic tape was playing, whereas the reports fail to mention the pornographic tape; (7) K.M. testified that Malone threatened her after the first incident of sexual abuse, whereas the reports fail to mention any threats made by Malone after the first sexual assault; and (8) K.M. testified that Malone made her "earn" a limousine ride for her twelfth birthday by performing oral sex and having sexual intercourse, whereas the reports fail to mention the limousine incident.[5]

---

[5] On appeal, Malone provides two additional inconsistencies, which were not included in defense counsel's offer of proof, that could have been explored had Gomsey testified:

(1) During cross-examination, K.M. denied ever reporting to Gomsey that Malone had ripped off her clothes during an incident at Uncle Tony's house, whereas the report stated that during the incident that occurred when Uncle Tony came home, Malone choked K.M. and began to rip off her clothes.

(2) Gomsey's report stated that K.M.'s school had called the house because she had detention and because her progress report was bad. According to the report, Malone offered K.M. a chance to "redeem herself" by performing oral sex. During cross-examination, K.M. denied telling Gomsey that the progress report and detention occurred at the same time.

After presenting his offer of proof, defense counsel admitted to the court that his failure to subpoena Gomsey was not a strategic decision but a "mistake."  The trial court responded to counsel's remark:

> I don't think you necessarily made a mistake; I think you obtained from the complaining witness the inconsistencies that were described to the officer, without permitting the officer to testify as to everything else that was told, because as I understand the doctrine, simply because someone makes an inconsistent statement, unless there's an accusation of recent contrivance, it doesn't make all other consistent statements admissible.  So you got the best of both worlds.  So I don't see where you made any mistake.

Malone was found guilty of three counts of rape and abuse of a child under sixteen and one count of indecent assault and battery on a child under fourteen.  Malone appealed and, while his direct appeal was pending, he filed a motion for a new trial in the Superior Court.  In the motion, Malone argued, among other things, that his trial counsel was ineffective for failing to serve Gomsey with a subpoena to compel her presence at trial.  Malone's motion for a new trial was denied by the Superior Court.

In his consolidated appeal to the Massachusetts Appeals Court, Malone raised the same ineffectiveness claim that had been rejected in his motion for a new trial.  The Appeals Court affirmed Malone's conviction and the denial of his motion for a new trial.  Commonwealth v. Malone, 780 N.E.2d 489, 2002 WL 31890964, at **1 - **2 (Mass. App. Ct. 2002) (unpublished table decision).  That court held that Malone was not denied effective assistance of counsel,

reasoning that the absence of Gomsey's testimony was "not significantly prejudicial" because she would have only provided "cumulative impeachment testimony." Malone, 2002 WL 31890964, at *1. Malone then filed an Application for Leave to Obtain Further Appellate Review with the SJC, which was summarily denied. See Commonwealth v. Malone, 843 N.E.2d 638 (Mass. 2006) (unpublished table decision).

Following the SJC's denial of further appellate review, Malone filed a federal habeas petition pursuant to 28 U.S.C. § 2254. The district court denied the petition, but granted a certificate of appealability on the ineffective assistance of counsel claim.

II.

We review the district court's denial of habeas corpus relief de novo. Teti v. Bender, 507 F.3d 50, 56 (1st Cir. 2007), cert. denied, 128 S. Ct. 1719 (2008). The district court's factual findings are reviewed for clear error, while mixed questions of law and fact are reviewed de novo. Norton v. Spencer, 351 F.3d 1, 4 (1st Cir. 2003); Familia-Consoro v. United States, 160 F.3d 761, 764-65 (1st Cir. 1998). Ineffective assistance of counsel claims are mixed questions of law and fact. Strickland v. Washington, 466 U.S. 668, 698 (1984).

This case is governed by the standards of review established by the Antiterrorism and Effective Death Penalty Act of 1996 ("AEDPA"), 28 U.S.C. § 2254, and the "well-established Strickland

- 16 -

test for ineffective assistance of counsel claims," <u>Sleeper</u> v. <u>Spencer</u>, 510 F.3d 32, 37 (1st Cir. 2007), <u>cert.</u> <u>denied</u>, 128 S. Ct. 2915 (2008) (citing <u>Strickland</u>, 466 U.S. at 687). We briefly review the governing law before turning to the merits of Malone's claim.

## A. AEDPA

Under the AEDPA, to be entitled to relief, Malone must demonstrate that the state court's resolution of his ineffective assistance of counsel claim "resulted in a decision that was contrary to, or involved an unreasonable application, of clearly established Federal law, as determined by the Supreme Court of the United States." 28 U.S.C. § 2254(d)(1); <u>Rompilla</u> v. <u>Beard</u>, 545 U.S. 374, 380 (2005).

A state court decision is "contrary to" the Supreme Court's clearly established precedents if (1) the state court applies either a legal rule that contradicts an established Supreme Court precedent or (2) reaches a different result on facts materially indistinguishable from those of a controlling Supreme Court precedent. <u>Williams</u> v. <u>Taylor</u>, 529 U.S. 362, 405-06 (2000).

The applicable precedent in this case is the well-known two-prong standard articulated in <u>Strickland</u>, 466 U.S. at 687. Although the state court[6] failed specifically to mention the

---

[6] The highest state court, the SJC, summarily denied Malone's habeas claim, <u>see</u> <u>Malone</u>, 843 N.E.2d 638, therefore, we "look

(continued...)

Strickland standard, applying instead Massachusetts's standard articulated in Commonwealth v. Saferian, 315 N.E.2d 878, 883 (Mass. 1974), we have held that "for habeas purposes, Saferian is a functional equivalent of Strickland," Ouber v. Guarino, 293 F.3d 19, 32 (1st Cir. 2002).[7] Thus, the state court did not apply a legal rule that contradicts an established Supreme Court precedent. See Williams, 529 U.S. at 405.

Additionally, this case does not fall under the "contrary to" category of the AEDPA. Although the Supreme Court has addressed a wide-variety of ineffective assistance of counsel cases, petitioner has pointed us to no Supreme Court case reaching a different result than the state court in the this case involving materially indistinguishable facts, nor have we found such a case.

---

[6](...continued)
through" to "the last reasoned decision," which is the decision of the Massachusetts Appeals Court. Gunter v. Maloney, 291 F.3d 74, 80 (1st Cir. 2002) (citing Ylst v. Nunnemaker, 501 U.S. 797, 804 (1991)).

[7] Under Saferian, the petitioner "must demonstrate that there 'has been serious incompetency, inefficiency, or inattention of counsel -- behavior of counsel falling measurably below that which might be expected from an ordinary fallible lawyer,'" and if that is found, the petitioner "must show that such behavior 'has likely deprived the defendant of an otherwise available, substantial ground of defence.'" Commonwealth v. Sargent, 870 N.E.2d 602, 610 (Mass. 2007) (quoting Saferian, 315 N.E.2d at 883). We have concluded that Saferian's "depriving the defendant of an otherwise available substantial ground of defense" prong subsumes Strickland's prejudice prong. See Ouber, 293 F.3d at 32 ("[T]he SJC has concluded that Saferian is at least as solicitous of Sixth Amendment rights as Strickland."); accord Stephens v. Hall, 294 F.3d 210, 214-15 (1st Cir. 2002).

"AEDPA[, however,] 'does not require state and federal courts to wait for some nearly identical factual pattern before a legal rule must be applied.'" Panetti v. Quaterman, 127 S. Ct. 2842, 2858 (2007) (quoting Carey v. Musladin, 127 S. Ct. 649, 657 (2006) (Kennedy, J., concurring)). Malone also would be entitled to relief if he shows that the state court unreasonably applied clearly established Federal law, as determined by the Supreme Court. See Rompilla, 545 U.S. at 380. An "unreasonable application" of federal law occurs when the state court identifies the correct legal principle, "but (i) applies those principles to the facts of the case in an objectively unreasonable manner; (ii) unreasonably extends clearly established legal principles to a new context where they should not apply; or (iii) unreasonably refuses to extend established principles to a new context where they should apply." Sleeper, 510 F.3d at 38 (citing L'Abbe v. DiPaolo, 311 F.3d 93, 96 (1st Cir. 2002)).

Neither (ii) nor (iii) applies in this case -- Malone is not arguing that the state unreasonably extended Strickland to a new context or that the state court unreasonably refused to extend Strickland to a new context. Thus, the question before us is whether the state court applied the principles of Strickland to the facts in Malone's case in an objectively unreasonable manner, to which we turn next.

- 19 -

B.    Ineffective Assistance of Counsel

To be entitled to relief for constitutionally ineffective assistance, under Strickland, Malone must show (1) deficient performance by counsel (2) resulting in prejudice. Rompilla, 545 U.S. at 380 (citing Strickland, 466 U.S. at 687).

While Malone must prove both prongs to prevail, we have held that "a reviewing court need not address both requirements if the evidence as to either is lacking." Sleeper, 510 F.3d at 39. That is, "[i]f it is easier to dispose of an ineffectiveness claim on the ground of lack of sufficient prejudice, which we expect will often be so, that course should be followed." Id. (citing Strickland, 466 at 697). That is the course we follow here.

C.    Malone Suffered No Prejudice

The prejudice prong requires Malone to demonstrate "a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." Strickland, 466 U.S. at 694. A reasonable probability is a probability sufficient to undermine confidence in the outcome. Id. "The assessment of prejudice should proceed on the assumption that the decisionmaker is reasonably, conscientiously, and impartially applying the standards that govern the decision." Id. at 695. "[A] court hearing an ineffectiveness claim must consider the totality of the evidence before the judge or jury." Id.

Malone argues that the state court's application of Strickland

was unreasonable because he was prejudiced by defense counsel's failure to subpoena Gomsey. To Malone, Gomsey was the "sole witness capable of discrediting the alleged victim's testimony." Malone argues, correctly, that in a case such as this, where the Commonwealth's presentation of physical evidence was limited, the credibility of the victim is particularly important. Given that, Malone argues that trial counsel's failure to insure Gomsey's presence at trial "crippled" the defense's ability to impeach K.M.'s credibility. Malone argues, "[t]he outcome of the trial might have well been different had the defense lawyer presented the prior inconsistent statements of the alleged victim through Officer Gomsey." Appellant's Br. at 19-20.

Malone, however, must show more. His burden is not to demonstrate that the outcome "might" have been different, but to demonstrate "a probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." Strickland, 466 at 694. Not only must Malone demonstrate that counsel's failure undermines our confidence in the outcome, see Strickland, 466 at 694, but he must also demonstrate that the state court applied Strickland's prejudice principles to the facts of the case in an objectively unreasonable manner, Sleeper, 510 F.3d at 38.

We have recognized that "where the relevant error is failure to impeach a government witness, we begin by assessing the strength

of the prosecution's case, and the effectiveness of the defense absent the impeachment evidence." Stephens v. Hall, 294 F.3d 210, 218 (1st Cir. 2002). We then consider "'the potential impeachment value' of the evidence 'in undermining the credibility of the witness's testimony.'" Id. (quoting Gonzalez-Soberal v. United States, 244 F.3d 273, 278 (1st Cir. 2001)).

### 1. The Strength of the Prosecution's Case

K.M.'s credibility was central to the prosecution's case. The Commonwealth presented no physical evidence. The parties did, however, stipulate that Brenda had delivered three videotapes containing pornographic scenes to the Yarmouth Police and that those tapes came from the home in which Malone resided. Brenda and Whitney did not testify to seeing sexual abuse, only physical abuse. Brenda testified to (1) seeing bruises on K.M.'s thighs and buttocks, (2) Malone hitting K.M. and Whitney clothed and unclothed with a belt, (3) walking in on Malone and K.M. lying on a bed and K.M. suddenly "jumping," and, (4) walking in on Malone beating a naked K.M. with a belt while she had a sock stuffed in her mouth. Whitney testified to (1) seeing bruises on K.M.'s thighs and (2) seeing the door closed on Malone's bedroom while K.M. and Malone were inside. Malone admitted to hitting his daughters, clothed and unclothed, with his hand and belt, and he admitted that he beat a naked K.M. with a belt while a sock was stuffed in her mouth. Malone, however, denied all allegations of sexual abuse. In

- 22 -

essence then, the case turned on whether the jury believed K.M.'s testimony of sexual abuse.

Even based on our review of the cold record, it is clear to us that K.M.'s testimony provided a vivid and descriptive account of years of sexual abuse by her father. The jury was able to observe K.M. as she recited the times in which her father allowed her to "redeem herself" by performing oral sex on him or by allowing him to have intercourse with her. The jury saw her face as she described the "favors" her father asked her to do. The jury heard K.M. testify that her father had cuffed her in the head, saying "Don't bite my shit," when she accidentally bit his penis. The jury heard her describe the beatings and the accounts of oral sex performed upon her father while pornographic movies were playing in the background. And the jury decided that with regard to the central question before it -- whether Malone had raped and sexually assaulted his daughter -- K.M., and not Malone, was believable.

The jury decided that K.M. was credible even though it was abundantly clear that K.M. had provided varying accounts as to some of the details of the assaults. Defense counsel highlighted many of these inconsistencies through cross-examination of K.M., Brenda, and Whitney. Indeed, of the eight "inconsistencies" that defense counsel listed in his offer of proof, defense counsel highlighted all but one of the inconsistencies on cross-examination.

2.  The Effectiveness of the Defense and the Potential
     Impeachment Value of Gomsey's Testimony

Malone contends that Gomsey's testimony would have impeached K.M. because Gomsey would have testified that K.M.'s testimony was inconsistent with what K.M. told Gomsey.  Defense counsel did, however, effectively attack K.M. with all but one of the alleged inconsistencies that Malone contends would have come out had Gomsey testified.  Defense counsel confronted K.M. with the reports' statements that:  (1) Tony never came home during a sexual assault, even though K.M. testified that Tony came home during a physical assault; (2) K.M. was physically assaulted, and not sexually assaulted, on Christmas Day 1998, and during cross-examination K.M. admitted that she had only reported the physical abuse to Gomsey; (3) Malone was clothed during the incident in which Brenda came home and nearly caught K.M. and Malone in a sexual act, and when confronted with this on cross-examination, K.M. denied telling Gomsey that Malone was clothed; and (4) Malone had offered the pager for one week of silence and the cell phone for three months of silence, and not one day and three weeks, respectively, as K.M. testified, and on cross-examination, K.M. denied telling Gomsey about her father's offer.  Defense counsel also confronted K.M. regarding events to which she testified that were omitted from Gomsey's reports.  The reports fail to mention that (5) Malone offered to pay $3,000 every three months in exchange for K.M.'s permanent silence, but K.M. insisted on cross-examination that she

did tell Gomsey about the $3,000; (6) a pornographic tape was playing during the first sexual assault, but K.M., on cross-examination, insisted that such a tape was playing during the assault and that she had told Gomsey about it; and (7) Malone threatened to kill K.M. after the first incident of sexual abuse, whereas K.M. testified on cross-examination that she "made sure" that Gomsey knew about the threat after the first incident. Of all the "inconsistencies" listed by the defense counsel in his offer of proof, only (8) was not touched upon at all during K.M.'s cross examination: the report's failure to mention that Malone made K.M. "earn" her limousine ride by performing oral sex and having sexual intercourse with him; counsel failed to question K.M. about that omission on cross-examination.[8]

Additional inconsistencies in K.M.'s trial testimony also were highlighted through the testimony and cross-examination of Brenda and Whitney. Brenda testified that K.M. had told her that Malone had told K.M. to wait at least three months before telling Brenda about the abuse, whereas K.M. testified that her father had given

_____

[8] Even the two additional inconsistencies that Malone raises for the first time on appeal were addressed at trial. Malone's counsel asked K.M. whether she had told Gomsey that her father began to rip off her clothes during the assault in which Tony came home, and K.M. denied telling that to Gomsey. Defense counsel also questioned K.M. about whether K.M. had told Gomsey that Malone's offer to "redeem herself" was in connection with the school calling home because K.M. had received detention and an unfavorable progress report, and K.M. denied telling Gomsey that the progress report and detention occurred at the same time.

her his pager for one day of silence and his cell phone for three weeks of silence. (Gomsey's report comports with Brenda's testimony, stating that Malone had promised K.M. his cell phone for "three months of silence.") Brenda also contradicted her daughter's testimony regarding details in connection with the sexual assault that occurred after K.M. stayed out too late and Malone "offered" her the chance to "redeem herself": K.M. testified that her father picked her up when she was out late one night, whereas Brenda testified that K.M.'s friend's mother picked up K.M.

K.M.'s younger sister's testimony was also inconsistent with K.M.'s testimony in some respects. Whitney testified that she remembered seeing her father the day after Christmas 1998, whereas K.M. testified that her father raped her on Christmas Day 1998. Even after reviewing Gomsey's report to refresh her recollection, K.M. stated that she did not remember telling Gomsey it was the day after Christmas. (Gomsey's report states that an incident with K.M. and Malone occurred "[t]he day after Christmas 1998 or near that time.")

Defense counsel even extracted an admission from K.M. that the details of her stories were not always consistent. When asked about what she said during her interviews with Gomsey, K.M. admitted that she "was not too good with memory," or at "remembering exactly what she said."

The defense was sufficiently effective in challenging K.M.'s

credibility based upon her inconsistencies that the prosecution felt compelled to address directly K.M.'s credibility in its closing argument. The prosecutor acknowledged that K.M.'s testimony concerning various details was not always consistent, and argued that

> for us to sit here in judgment and to say, ["]You don't know the exact dates and times, you don't know how you've gotten to the car or who picked you up from a certain time and place["] is not reasonable. It's not even logical. It doesn't even make common sense, to think that she would be able to decipher between each and every time that this man raped her[.]

The jury knew full well that K.M. had told inconsistent stories regarding various details of the rapes. K.M., the defense, and the prosecution all acknowledged as much to the jury.

### 3. The Totality of the Evidence

After reviewing the totality of the evidence before the jury, we conclude that the potential impeachment value of Gomsey's testimony would not have significantly undermined K.M.'s credibility. Although we have noted that "a significant factor weighing in favor of finding prejudice is the absence of any corroborating evidence other than the testimony of the witness whom defense counsel failed to impeach," Stephens, 294 F.3d at 225 (citing Gonzalez-Soberal, 244 F.3d at 278), here, defense counsel did not fail to impeach K.M. And the jury was repeatedly presented with K.M.'s inconsistent statements, inconsistencies that the prosecution acknowledged. The jury nevertheless found K.M.

credible regarding the allegations of sexual abuse.

Moreover, calling Gomsey to testify would have come with a price. Gomsey's report states that she knew K.M. through working at K.M.'s middle school and that she "kn[e]w [K.M.] to be a good person and to my knowledge had always been truthful with me." As the state court noted, given that "Officer Gomsey's potential testimony would have been cumulative of testimony already in evidence," Malone may well have benefitted from her absence. See Malone, 2002 WL 31890964, at *1. That is, as the trial judge told Malone's counsel, and the state appellate court quoted approvingly, Malone "obtained from the complaining witness the inconsistencies that were described to the officer, without permitting the officer to testify as to everything else that was told[.]" See id.

Therefore, we conclude that the state court's decision that Malone was not prejudiced by his counsel's failure to call Gomsey was not an unreasonable application of Strickland. While unreasonableness may, at times, be "difficult to define," McCambridge v. Hall, 303 F.3d 24, 36 (1st Cir. 2002) (en banc), we have no difficulty in concluding in this case that the state court did not commit AEDPA error. We cannot say that the state court's decision was unreasonable in the independent and objective judgment of this court. In fact, we agree with the state court. Gomsey's failure to testify does not undermine our confidence in the outcome of Malone's trial.

III.

Because the state court did not unreasonably apply the Strickland standard to the facts of Malone's case, its determination that Malone was not prejudiced by his counsel's failure to subpoena Gomsey was not error under the AEDPA.

The district court's denial of Malone's habeas petition is AFFIRMED.